## STATE v. EDWARD L. SMITH.[1]

June 29, 1934.

No. 30,029.

*John F. Dahl,* for appellant.

*Harry H. Peterson,* Attorney General, *Roy C. Frank,* Assistant Attorney General, *M. F. Kinkead,* County Attorney, and *James F. Lynch,* Assistant County Attorney, for the state.

[1]Reported in 255 N. W. 826.

238

*LORING, Justice.*

Edward L. Smith was convicted of attempted grand larceny in the first degree. From an order denying his motion for a new trial this appeal is taken.

February 26, 1934, Smith, giving his name as Burns, and one Abe Ginsberg, representing himself to be Arthur Gellar, an attorney of Denver, Colorado, appeared at the home of the Reverend Alphonse J. Carey, a Catholic priest, in St. Paul. Ginsberg told Father Carey that one Joseph Cochrane of Denver, a former resident of St. Paul, had died and by will had bequeathed to a Reverend A. J. Carey a certificate of stock in a gold mining company and that he and Smith were attempting to locate the beneficiary. Ginsberg, who did most of the talking, interrogated Carey at length as to his acquaintance with Cochrane, whom the priest denied knowing. He also inquired as to the possibility that there might be another Reverend A. J. Carey in St. Paul or Minneapolis. In general, his talk carried an insidious suggestion to Carey that he was the person named in Cochrane's will. Smith told the priest that the certificate in question was worth $450,000. Ginsberg said that the certificate could be readily sold since an eastern financier was endeavoring to buy the mine and would be forced to buy the certificate in order to get a clear title to the mining properties. However, Ginsberg and Smith intimated that they were not quite satisfied that Father Carey was the Reverend A. J. Carey mentioned in the will but that they would make a more thorough investigation in and around St. Paul and would then get in touch with him again. The men left Carey's home after stating that they expected a man from Denver in the next few days who would bring the stock certificate that had been willed to the Reverend A. J. Carey. The following evening Father Carey received a telephone call from a person who stated that he was the man expected by Ginsberg and Smith and asked if Carey knew where the men were staying. Father Carey stated that he did not know. On the day following this conversation Father Carey received another telephone call from a man whose voice he recognized as that of Smith. Smith stated that Father Carey was the man they were looking for as the bene-

ficiary of Cochrane's will, and a meeting was arranged for the next day. At this meeting, which took place at the priest's home, Smith, Father Carey, and a man named LaDue, representing himself to be Hutchinson, the agent of a New York brokerage house, were present. The stock certificate, which bore the indorsement of Joseph Cochrane, was shown to Father Carey; also a Denver paper purporting to show market quotations of the stock. LaDue stated that it would be necessary for Carey to advance $10,800 for expenses and taxes necessary to the transfer of the stock. Father Carey said that he did not have that amount but that he had about $6,000 in bonds at the bank which he would turn over to the men. It was arranged that Father Carey was to go to the bank the next morning and get the bonds and that the three men were to call at the priest's home later that morning to get them. After the men had left, Father Carey became suspicious and called the police. It was arranged that the police were to secrete themselves in the priest's house the next morning. Father Carey, with a policeman secreted in his car, drove to the bank, entered his safety deposit vault there, and simulated placing the bonds in a bag which he carried. He then returned home, and a few minutes later Smith, Ginsberg, and LaDue drove up to and entered the house. They were there arrested. Upon the trial it was proved that Ginsberg was not Arthur Gellar and was not a Denver attorney connected with any firm in that city; that LaDue, *alias* Goldberg and *alias* Hutchinson, was not an agent of a New York brokerage house; that there was no estate of Joseph Cochrane being probated in Denver in which Alphonse J. Carey was a beneficiary; that the certificate of stock was worthless.

Appellant presents three assignments of error: (1) That the verdict is not sustained by the evidence; (2) that it was error for the court to charge the jury that it was not necessary to a conviction for the state to show that Father Carey believed or relied upon the representations made by the three conspirators; and (3) that the court erred in not defining for the jury the particular crime with which the defendant was charged.

Smith represented himself to be Burns and acquiesced in the deception that Ginsberg was Arthur Gellar, a Denver attorney.

The evidence was sufficient to sustain a finding that he made the telephone call to Father Carey informing him that he was the man they sought; and, although taking a minor part in the first conversation with the priest, he supported the truth of Ginsberg's representations, which it is obvious he knew to be false. He also stated that the worthless stock certificate purported to have been left by Cochrane was worth $450,000. From the complainant's testimony we find ample evidence to support the verdict. Defendant's claim that he believed Ginsberg's story is too absurd for credence.

■ It is a well settled rule of law that in order to sustain a conviction for an attempt to obtain money upon false representations it is not necessary that the complainant believe the false representations. Appellant concedes that this rule is sustained by the weight of authority. The leading case is Commonwealth v. Johnson, 312 Pa. 140, 167 A. 344, 89 A. L. R. 333. The annotations to that case in 89 A. L. R. 342, cite several cases supporting its holding. We think the majority opinion in the Johnson case to be the correct rule. Although the Johnson case was a prosecution for obtaining money under false pretenses, the same rule applies to the case at bar. As said in People v. Spolasco, 33 Misc. 22, 67 N. Y. S. 1114, 1115:

"It would be equally unreasonable to hold that the credulity or incredulity of the intended victim as to false statements made could have any effect upon that which constitutes the essence of the crime of attempt, namely, 'an act done with intent to commit a crime, and tending, but failing, to effect its commission.'"

■ The court charged the jury that in order to convict the defendant the state must have established beyond a reasonable doubt that the defendant was guilty of attempted grand larceny in the first degree as set forth in the statute and "as charged in the indictment." The elements of the crime were set up in the indictment. No request was made more particularly to define the crime with which the defendant was convicted, nor was any exception taken to the charge as given. We think the charge sufficient.

The order appealed from is affirmed, and the sentence imposed by the trial court is directed to be executed.