## STATE v. DANIEL ST. CHRISTOPHER.

232 N. W. 2d 798.

August 29, 1975—No. 45270.

*Adamson & Kennedy* and *Michael H. Kennedy,* for appellant.

*Warren Spannaus,* Attorney General, *Peter W. Sipkins,* Solicitor General, *Richard Mark,* Assistant Solicitor General, *Richard B. Allyn* and *Gary Hansen,* Special Assistant Attorneys General, and *William M. Gustafson,* County Attorney, for respondent.

ROGOSHESKE, JUSTICE.

Defendant was found guilty by the court, sitting without a jury, of conspiracy to commit murder, Minn. St. 609.175, subd. 2, and attempted first-degree murder, Minn. St. 609.17, and sentenced under the conspiracy conviction to a maximum indeterminate term of 20 years' imprisonment. He contends upon this appeal from the judgment (1) that he was improperly convicted of conspiracy because the evidence shows that the only party with whom he conspired never intended to aid defendant but merely feigned agreement while cooperating with police; (2) that the trial court erred in finding him guilty of attempted murder because the information did not charge him with that crime and attempted murder is not, under Minn. St. 609.04, a lesser included offense of the charge of conspiracy to commit murder; and (3) that, even if there is no merit to the first two contentions, he is still entitled to a new trial because of (a) improper admission of hearsay evidence, (b) bias on the part of the trial court, and (c) newly discovered evidence. We affirm the conviction of conspiracy and reverse the conviction of attempted first-degree murder.

The facts in this case are relatively simple. On March 16, 1974, defendant (who formerly was named Marlin Peter Olson but legally changed his name to Daniel St. Christopher) stated to his cousin, Roger Zobel, that he wanted to kill his mother, Mrs. Marlin Olson, and that he wanted Zobel's help. He would pay him $125,000 over the years, money defendant would get from his father after his mother was dead. Zobel, the key witness against defendant at his trial on the charge of conspiracy, testified that at no time did he ever intend to participate in the murder but that he discussed the matter with defendant on that and subsequent occasions and acted as if he intended to participate in the plan. On March 18, Zobel contacted the police and told them of defendant's plan and they later told him to continue to cooperate with defendant. The plan, which became definite in some detail as early as March 20, was for Zobel to go to the Olson farmhouse on Saturday, March 23, when defendant's father was at the weekly livestock auction. Since defendant's mother was Zobel's aunt, Zobel could gain entrance readily. The idea was for Zobel to break her neck, hide her body in his automobile trunk, and then attach bricks to it and throw it in a nearby river after dark. Later it developed that defendant's father might not go to the sale on Saturday, so a plan was developed whereby defendant would feign car trouble, call his father for help, then signal Zobel when the father was on his way. Police followed defendant on Saturday when he left his apartment and observed him make a number of telephone calls. In one of these he called his father and told him he was having car trouble and asked him to come and help him pay the bill. In a call to Zobel, which was taped, defendant told Zobel that his father was coming and that Zobel should proceed with the plan. Shortly thereafter, police arrested defendant.

During the trial defense counsel, in a motion to dismiss, made it clear to the trial court that he felt defendant could not be convicted of conspiracy. He argued that since Zobel never intended to participate in a murder, he did not really conspire with de-

fendant. The trial court was obviously troubled by this argument because, after the evidence was in and after he revealed that he believed the state's witnesses, he asked counsel what they thought of his finding defendant guilty of conspiracy, as charged, and of attempted murder as an included offense. The prosecutor at first expressed doubts at the fairness of convicting defendant of a crime with which he had not been charged but later agreed with the trial court that it could find defendant guilty of attempted murder. The prosecutor insisted, however, that he preferred that the trial court find defendant guilty of conspiracy. As it turned out, the trial court found defendant guilty of both conspiracy and attempted murder, sentencing defendant for the conspiracy offense to an indeterminate term of 20 years' imprisonment.[1]

■ We have not found any Minnesota cases in point on the issue of the validity of the conspiracy conviction. However, in two criminal conspiracy cases this court has stated, or at least implied, that a person cannot be guilty of conspiracy where the only person with whom he has conspired or agreed has feigned agreement. The first of these cases is State v. Burns, 215 Minn. 182, 186, 9 N. W. 2d 518, 520 (1943), where this court stated that "[t]o constitute a conspiracy to cheat and defraud, there must be not only a combination, but a common object to cheat and defraud, which each member of the combination intends shall be accomplished by the concerted action of all."[2]

The more recent Minnesota case is State v. Willman, 296 Minn. 322, 208 N. W. 2d 300 (1973). In that case, there was a true meeting of the minds by both defendant and one Toles followed by

---

[1] In his order, the trial court stated his conclusion that defendant was guilty of conspiracy *or* of attempted murder, but in his sentence, he stated that he found defendant guilty of both offenses.

[2] Actually, this dictum does not accurately state the rule which courts have followed. The fact that A's agreement is feigned does not prevent a conspiracy conviction of B where C is also involved and has not feigned agreement. Note, 72 Harv. L. Rev. 920, 926, note 35.

an overt act in furtherance of the conspiracy to commit murder in the first degree. Subsequently, Toles changed his mind and contacted the police. In holding that there was sufficient evidence that defendant was guilty of conspiracy, this court arguably implied (but did not hold or even say) that this might not be the case if there had not been a true meeting of the minds or if an overt act had not occurred until after Toles contacted the police.

There is extensive authority from other jurisdictions which supports defendant's contention. The reasoning employed in these cases was summarized in Fridman, *Mens Rea in Conspiracy*, 19 Modern L. Rev. 276, as follows:

"\* \* \* Conspiracy is the agreement of two or more to effect an unlawful purpose. Two people cannot agree unless they both intend to carry out the purpose which is stated to be the object of their combination. Therefore there is no agreement, and consequently no conspiracy, where one of the two never intends to carry out the unlawful purpose."

Cases that so hold include United States v. Chase, 372 F. 2d 453 (4 Cir. 1967), certiorari denied, 387 U. S. 907, 87 S. Ct. 1688, 18 L. ed. 2d 626 (1967); Sears v. United States, 343 F. 2d 139 (5 Cir. 1965); United States v. Wray, 8 F. 2d 429 (N. D. Ga. 1925); King v. State, 104 So. 2d 730 (Fla. 1958); State v. Horton, 275 N. C. 651, 170 S. E. 2d 466 (1969), certiorari denied, 398 U. S. 959, 90 S. Ct. 2175, 26 L. ed. 2d 545 (1970); Delaney v. State, 164 Tenn. 432, 51 S. W. 2d 485 (1932); Woodworth v. State, 20 Tex. App. 375 (1886).

If there had been some evidence to suggest that, contrary to his testimony, Zobel in fact had intended to participate in the conspiracy and had not feigned agreement from the start, then the court as factfinder could have found defendant guilty of conspiracy without rejecting the rule followed in the cited cases. See, State v. Horton, *supra*. However, the only evidence that the state produced was that Zobel did not intend at any time to participate

in the conspiracy and that his agreement was feigned, and the trial court believed this evidence. Therefore, if we accept the rule followed in these cases, we would have to reverse defendant's conviction.

We are persuaded not to accept this rule and base our decision on (a) our belief that the rule is unsound, and (b) our belief that the present conspiracy statute, § 609.175, subd. 2, authorizes a conviction in this situation.

(a)    One criticism by a number of commentators of the rule followed in the cited cases is that the courts have reached their conclusion by using as a starting point the definition of conspiracy as an agreement between two or more persons, a definition which was framed in cases not involving the issue. As one commentator put it, "if a conspiracy is arbitrarily defined as 'an agreement of intentions and not merely of language (the intentions being unlawful)' the answer to the problem is undoubtedly that where there is no such agreement of intentions then there is no conspiracy." Fridman, *Mens Rea in Conspiracy*, 19 Modern L. Rev. 276, 278. In other words, the basis for the rule is a strict doctrinal approach toward the conception of conspiracy as an agreement in which two or more parties not only objectively indicate their agreement but actually have a meeting of the minds.

Addressing the rule to be applied as a policy issue, a number of commentators have come to the conclusion that there should be no requirement of a meeting of the minds. Thus, Fridman points to cases holding that factual impossibility is no defense to a charge of attempt to commit a crime[3] and argues that, because of close connections between the origins and purposes of the law of conspiracy and of attempt, a similar rule should obtain in conspiracy. Specifically, he argues that "[t]he fact that, unknown to a man who wishes to enter a conspiracy to commit some criminal purpose, the other person has no intention of fulfilling that purpose ought to be irrelevant as long as the first man does

---

[3] One such case, not cited by Fridman, is State v. Smith, 192 Minn. 237, 255 N. W. 826 (1934).

intend to fulfill it if he can" because "a man who believes he is conspiring to commit a crime and wishes to conspire to commit a crime has a guilty mind and has done all in his power to plot the commission of an unlawful purpose." Id. at 282, 283.

Professor Glanville Williams makes a somewhat similar argument, basing his opinion on the fact that conspiracy, like attempt, is an inchoate crime and that it is the act of conspiring by a defendant which is the decisive element of criminality, for it makes no difference in logic or public policy that the person with whom the defendant conspires is not himself subject to prosecution. Williams, Criminal Law—The General Part, § 157 (a).

The draftsmen of the Model Penal Code[4] take a slightly different approach. They recognize that conspiracy is not just an inchoate crime complementing the law of attempt and solicitation but that it is also a means of striking at the special dangers incident to group activity. A. L. I., Model Penal Code (Tent. Draft No. 10, 1960) § 5.03, Comment. In view of that recognition, it is probably not quite as easy to reject the approach taken by the cases cited, yet this is what the draftsmen have done. The provision which accomplishes this, § 5.03(1),[5] reads as follows:

"A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:

"(a)  agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

"(b)  agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime." 10 U. L. A., Model Penal Code, § 5.03 (1).

---

[4] Chief reporter was Herbert Wechsler, Professor at Columbia Law School.

[5] The A. L. I. Council voted 14-11 to approve this provision, A. L. I., Model Penal Code (Tent. Draft No. 10, 1960) § 5.03(1), Comment.

In comments explaining this provision, the reporters state as follows:

"2. *The Conspiratorial Relationship.*

"*Unilateral Approach of the Draft.* The definition of the Draft departs from the traditional view of conspiracy as an entirely bilateral or multilateral relationship, the view inherent in the standard formulation cast in terms of 'two or more persons' agreeing or combining to commit a crime. Attention is directed instead to each individual's culpability by framing the definition in terms of the conduct which suffices to establish the liability of any given actor, rather than the conduct of a group of which he is charged to be a part—an approach which in this comment we have designated 'unilateral.'

"One consequence of this approach is to make it immaterial to the guilt of a conspirator whose culpability has been established that the person or all of the persons with whom he conspired have not been or cannot be convicted. Present law frequently holds otherwise, reasoning from the definition of conspiracy as an agreement between two or more persons that there must be at least two guilty conspirators or none. The problem arises in a number of contexts.

\*   \*   \*   \*   \*

"*Second:* Where the person with whom the defendant conspired secretly intends not to go through with the plan. In these cases it is generally held that neither party can be convicted because there was no 'agreement' between two persons. Under the unilateral approach of the Draft, the culpable party's guilt would not be affected by the fact that the other party's agreement was feigned. He has conspired, within the meaning of the definition, in the belief that the other party was with him; apart from the issue of entrapment often presented in such cases, his culpability is not decreased by other's secret intention. True enough, the project's chances of success have not been increased by the agreement; indeed, its doom may have been sealed by this turn of events. But the major basis of conspiratorial liability—the un-

equivocal evidence of a firm purpose to commit a crime—remains the same. The result would be the same under the Draft if the only co-conspirator established a defense of renunciation under Section 5.03(6). While both the Advisory Committee and the Council support the Draft upon this point, it should be noted that the Council vote was 14-11, the dissenting members deeming mutual agreement on the part of two or more essential to the concept of conspiracy."[6]

(b)   We find the scholarly literature persuasive on this subject.[7] The question is whether this court can take the recommended approach. We think the answer lies in the wording of our statute. The Minnesota statute formerly dealing with the crime of conspiracy read as follows (Minn. St. 1961, § 613.70):

"When two or more persons shall conspire:
(1)   To commit a crime;

\*   \*   \*   \*   \*

"Every such person shall be guilty of a misdemeanor."

This is the most common type of conspiracy statute,[8] and it is understandable that this type of statute lends itself easily to the

---

[6] The proposed Federal Criminal Code takes a similar approach. The full text of the conspiracy section, § 1-2A5, is reproduced and discussed in Note, 47 Tulane L. Rev. 1017. See, also, Final Report of the National Commission on Reform of Federal Criminal Laws (1971) § 1004.

[7] An alternative approach would be to say that in cases of this sort the factfinder may find the defendant guilty of attempted conspiracy. This is the approach recommended in Note, 72 Harv. L. Rev. 920, 926, note 35. The approach is undesirable because it would result in disparate sentences for defendants whose conduct was the same, the length of sentence turning on a fortuity. Thus, if A agreed with B (a policeman who merely feigns agreement) to commit murder, A would be guilty of attempted conspiracy and could receive a maximum of 10 years' imprisonment, whereas if A agreed with C (who does not feign agreement), A could be guilty of conspiracy and could receive a maximum of 20 years' imprisonment. See, Minn. St. 609.17, subd. 4(2), and 609.175, subd. 2(2).

[8] A. L. I., Model Penal Code (Tent. Draft No. 10, 1960) § 5.03, Appendix.

result reached by the cases because the statute starts with the phrase, "When two or more persons shall conspire."

However, the Minnesota statute as it presently reads omits this phrase and is now phrased in unilateral terms similar to those used in the Model Penal Code. The provision, Minn. St. 609.175, subd. 2, reads in part:

"Whoever conspires with another to commit a crime and in furtherance of the conspiracy one or more of the parties does some overt act in furtherance of such conspiracy may be sentenced as follows:"

Because of this wording, we hold that the trial court was free to convict defendant of conspiracy under the facts of this case.

■ The second issue raised by defendant is whether he was properly convicted of attempted murder. We hold that he was not and reverse this part of the judgment.

Because defendant was charged only with conspiracy to commit murder, the trial court could not find him guilty of attempted murder unless attempted murder is an included offense of conspiracy to commit murder. We believe that under § 609.04, subd. 1, attempted murder is not, as the state contends, necessarily proved by proof of conspiracy to commit murder. First, the cases do not support such a contention. See, e.g., People v. Travis, 171 Cal. App. 2d 842, 341 P. 2d 851 (1959), which held that a judgment of attempted theft could not stand where the indictment charged the offense of conspiracy to commit theft but not the offense of theft.

Secondly, one proves conspiracy to murder by proving that defendant agreed with another to commit murder and by proving some overt act in furtherance of the conspiracy (and courts generally discover an overt act in the slightest action on the part of a conspirator). In order to prove attempt to murder, one must prove that defendant took a substantial step toward, and did more than merely prepare for, the crime—which is something one need not prove in conspiracy. As stated in Sayre, *Criminal Conspiracy*, 35 Harv. L. Rev. 393, 399:

"* * * [E]very criminal conspiracy is not an attempt. One may become guilty of conspiracy long before his act has come so dangerously near to completion as to make him criminally liable for the attempted crime. For instance, as Justice Holmes has pointed out, the mere agreement to murder a man fifty miles away could not possibly constitute an attempt, but might easily be indictable as a conspiracy. [Hyde v. United States, 225 U. S. 347, 388, 32 S. Ct. 793, 810, 56 L. ed. 1114, 1134 (1912).]"

In any event, even if attempted murder were an included offense of conspiracy to commit murder, the trial court could not have found defendant guilty of attempted murder in view of his finding defendant guilty of the crime charged. This is because § 609.04, subd. 1, specifically provides that "[u]pon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both."[9]

We therefore reverse defendant's conviction of attempted murder.

■ (a) Defendant's contention that the trial court erred in admitting testimony by Zobel as to damaging statements defendant made to him is based on a misconception of the rule concerning admission against a defendant of evidence of extrajudicial declarations of a coconspirator. The rule to which defendant refers is that evidence of extrajudicial declarations of one coconspirator, made during the pendency of the conspiracy and in furtherance of it, is admissible against every other conspirator, including those who joined the conspiracy later, provided that a foundation for its admission is laid by independent prima facie proof. See, e.g., State v. Thompson, 273 Minn. 1, 139 N. W. 2d 490 (1966), certiorari denied, 385 U. S. 817, 87 S. Ct.

---

[9] See, State v. Leinweber, 303 Minn. 414, 228 N. W. 2d 120 (1975). Of course, if attempted murder had also been charged and assuming the evidence sufficient to sustain the conviction, it could be upheld as a conviction of a separate offense arising during the course of a single behavioral incident with defendant's punishment limited to but one of the offenses of which he was convicted. Minn. St. 609.035.

39, 17 L. ed. 2d 56 (1966). And see, 22A C. J. S., Criminal Law, §§ 754 to 785; McCormick, Evidence (2 ed.) § 267, pp. 645, 646; Note, 72 Harv. L. Rev. 920, 984; Levie, *Hearsay and Conspiracy*, 52 Mich. L. Rev. 1159. Defendant contends that under this rule the trial court erred in letting Zobel testify as to defendant's out-of-court statements because there was insufficient independent prima facie proof to serve as foundation for admission of the statements. Actually, this court held in State v. LaJambe, 300 Minn. 539, 219 N. W. 2d 917 (1974), that the bootstrap argument has no application in a case where the party with whom defendant conspired himself takes the stand and testifies to the existence of a conspiracy. We hold defendant's out-of-court statements were clearly admissible under the admissions exception to the hearsay rule.

(b)  The claim by defendant that the trial judge should have disqualified himself is based upon the claims that (i) prior to trial defendant expressed a preference for another judge; (ii) prior to trial the judge heard testimony concerning a claim by defendant that he had been mistreated by the county sheriff; (iii) during the trial the judge witnessed part of a courtroom scuffle involving defendant; (iv) during the trial the judge heard prejudicial information when a prosecutor sought to introduce other-crimes evidence; and (v) after the evidence was in, the trial judge stated to counsel that it would be a shocking outcome if the law had no means to deal with such conduct as defendant's.

(i)  It is true that prior to trial defendant expressed a preference for a judge other than the one who heard his case. However, this judge gave defendant the option of waiting 2 weeks until either of two other judges was available, but defendant refused to wait, saying he wanted to proceed immediately.

(ii)  It is true that prior to trial the trial court heard testimony concerning a claim by defendant that the sheriff had mistreated him, but defendant raised this matter. The trial court did let the state call a witness so that defendant's statements did not go unchallenged on the record but then changed his mind

after just a few minutes of testimony, saying he did not want to hear anything that might deprive defendant of a fair trial.

(iii)    It is true that there was a courtroom scuffle during the trial, but the record shows that the trial court had no personal knowledge of what happened because it occurred during a recess. The judge stated that he would have no trouble proceeding fairly and defense counsel stated that since no jury was present he would not move for a mistrial.

(iv)    It is true that the state tried to introduce certain other-crimes evidence during the trial, but this often happens in a trial before a court without a jury since the factfinder is the same person who has to rule on the admissibility of the evidence.

(v)    The cited statement by the trial court was made after the evidence was in and after the trial court had stated his findings. We fail to see how the statement shows that the trial court was biased.

(c)    The so-called newly discovered evidence consists of an affidavit by defendant's girl friend which has never been presented to the trial court and which is dated several months after trial, in which she states that Zobel raped her the day before the trial started. The affidavit states further that police told her not to tell anyone about the offense and that to bring charges against Zobel would endanger the prosecution of defendant. Defendant contends that if he had known of this he could have impeached Zobel's testimony, and that the evidence would have supported his claim that Zobel wanted him out of the way so that Zobel could make advances toward the girl friend.

Defendant should have presented this evidence to the trial court along with a motion for a new trial and he can present it in the form of a petition for postconviction relief. It certainly would not be appropriate for this court to order a new trial on the basis of newly discovered evidence before the trial court has even had an opportunity to hear the evidence and consider the issue of whether the evidence is credible and whether it probably

would change the result. See, State v. Mastrian, 285 Minn. 51, 72, 171 N. W. 2d 695, 708 (1969).

Affirmed in part, reversed in part.