STATE v. CHRISTINE PETERSON.[1]

July 3, 1942.

No. 33,168.

[1]Reported in 4 N. W. (2d) 826.

 

*Ernest F. Jacobson,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, *Ed J. Goff,* County Attorney, and *William G. Compton,* Assistant County Attorney, for the State.

PETERSON, JUSTICE.

Defendant was convicted of arson in the second degree, and appeals.

The indictment charges her with burning her dwelling house on October 30, 1940. The house was at Lake Minnetonka in Hennepin county.

The state claimed, and its evidence was to the effect, that she did not personally set the fire, but caused it to be set by an accomplice, one August Anderson. There was no dispute as to Anderson's having set the fire. Defendant stoutly maintained that she did not have anything to do with the burning of her house and that she not only directed Anderson not to go to the house on the occasion when the fire was set, but that she tried to persuade him before he set the fire to leave the premises to which he had gone contrary to her directions.

On Monday, October 28, 1940, defendant was injured in a collision between a streetcar and her automobile in which she was riding. She was taken to a hospital in Minneapolis, where she remained until Friday, November 1. On the 29th, Anderson visited her at the hospital. She inquired whether he had taken possession of a box which she had in the automobile containing approximately $200 which she intended to use to pay her taxes. His answers did not satisfy her. He told her that he was going to the lake, which both of them apparently understood to mean that he was going out to her house. She claims that she objected to his going to the lake and exacted a promise from him not to go.

At that time, according to the testimony of both of them, he did not tell her that he was going to set the fire, and she did not direct him to do so.

He left for the house at the lake on the evening bus at seven. He spent the night there. After making preparations, he set the fire on the evening of the 30th.

The claim of the state was that a very close relationship existed between Anderson and defendant, with the result that he had come under her domination and control. It was said that he worshiped the ground on which she walked. At any rate, it appears that in July 1921 she went to his four-flat building in Minneapolis to take care of him during his illness. He was then about 61 and she about 25 years of age. Later she took up her abode there and cared for him. Finally he gave her a deed to the flat building, which he recorded. He took back a quitclaim deed, which he did not record, so that he would get the property if she died before he did.

There was much evidence, mostly testimony by Anderson, that for some considerable time before the fire he and defendant planned to burn the house. It was claimed that she overinsured the house and contents with that event in view. Defendant denied the claims of the state. She claimed that the insurance did not cover the replacement value of the house.

However much the claims and the evidence of the parties may have conflicted, there was no denial of the fact that on October 30 defendant tried, before the fire was set, to induce Anderson to leave the house and come to Minneapolis. Defendant sent one Victor Carlson out to the house in his automobile to get Anderson and bring him to Minneapolis. Carlson made two trips for the purpose, one in the morning and another in the afternoon. In the morning he rapped on the door, but there was no answer. Anderson testified that he heard the rap but did not answer because he thought it was the milkman. In the afternoon Carlson looked through a window and saw Anderson sitting on a chair reading a newspaper. He rapped on the window, and Anderson

went to see what he wanted. He told Anderson that defendant wanted him to come to the hospital immediately. Anderson testified that Carlson said to him that defendant wanted him to come to the hospital "quick." But he refused to go along with Carlson, stating that he would take the bus. Carlson then returned to Minneapolis. Anderson left later, but before doing so he set seven separate fires. He caught the 6:20 bus for Minneapolis. He went to defendant in the hospital and told her that he "had started the fires." She told him that she did not want her house burned and directed him to take a taxicab and "go right back and put the fires out." Not having taxicab fare, he took a bus. When he arrived at the lake the house was burning and the fire department was attempting to extinguish the fire. He then returned to his four-flat building and went to bed.

Numerous errors are assigned to the effect (1) that the only evidence implicating defendant was the uncorroborated testimony of Anderson, an admitted accomplice according to the state's theory; (2) that, aside from lack of corroboration, Anderson's testimony was so badly discredited and shown to be so unreliable that no conviction could be based thereon; (3) that the court erred in its rulings on the admissibility of evidence and in the charge; and (4) that, assuming the truth of the state's evidence that Anderson and defendant were accomplices, defendant is not liable because she withdrew before the fire was set. Since it is decisive, only the last point need be discussed.

It is important to bear in mind that defendant is not charged with the crime of conspiracy. A conspiracy to commit arson is a misdemeanor. Mason St. 1927, §§ 10055, 10056. Arson is a felony. *Id.* §§ 10309-10310; *Id.* 1940 Supp. § 10311. A conspiracy to commit a crime is a separate offense from the crime which is the object of the conspiracy. State v. Townley, 142 Minn. 326, 171 N. W. 930; Dill v. State, 35 Tex. Cr. 240, 33 S. W. 126, 60 A. S. R. 37.

One who has procured, counseled, or commanded another to commit a crime may withdraw before the act is done and avoid

criminal responsibility by communicating the fact of his withdrawal to the party who is to commit the crime. Karnes v. State, 159 Ark. 240, 252 S. W. 1; People v. King, 30 Cal. App. (2d) 185, 85 P. (2d) 928; People v. Ortiz, 63 Cal. App. 662, 219 P. 1024; State v. Allen, 47 Conn. 121; Pinkard v. State, 30 Ga. 757; State v. Kinchen, 126 La. 39, 52 So. 185; State v. Webb, 216 Mo. 378, 115 S. W. 998, 20 L.R.A.(N.S.) 1142, 129 A. S. R. 518, 16 Ann. Cas. 518; State v. Hayes, 78 Mo. 307; People v. Nichols, 230 N. Y. 221, 129 N. E. 883; Commonwealth v. Doris, 287 Pa. 547, 135 A. 313. The rule is illustrated and has been discussed at great length in cases involving conspiracies to commit crimes. Hyde v. United States, 225 U. S. 347, 32 S. Ct. 793, 56 L. ed. 1114, Ann. Cas. 1914A, 614; United States v. Beck (7 Cir.) 118 F. (2d) 178; Marino v. United States (9 Cir.) 91 F. (2d) 691, 113 A. L. R. 975; Eldredge v. United States (10 Cir.) 62 F. (2d) 449; United States v. Stevens (D. C.) 44 F. 132. A typical example of the expressions used in the books is found in United States v. Britton, 108 U. S. 199, 2 S. Ct. 531, 534, 27 L. ed. 698, where the court said:

"The offence charged in the counts of this indictment is a conspiracy. This offence does not consist of both the conspiracy and the acts done to effect the object of the conspiracy, but of the conspiracy alone. The provision of the statute, that there must be an act done to effect the object of the conspiracy, merely affords a *locus penitentiae*, so that before the act done either one or all of the parties may abandon their design, and thus avoid the penalty prescribed by the statute."

In England it is said that if the procurer of a felony countermands his consent before the act is done, and the principal nevertheless commits the felony with the knowledge of the countermand, the procurer is not liable as an accessory. 9 Halsbury's Laws of England (Hailsham 2d) p. 35, § 34; 2 Russell, Crime (9 ed.) p. 1491.

The principle that an accessory is criminally responsible for having set in motion a criminal agent and that he may avoid

such responsibility by terminating the agency before the commission of the crime is illustrated by the case of Hyde v. United States, 225 U. S. 347, 369, 32 S. Ct. 793, 803, 56 L. ed. 1114, Ann. Cas. 1914A, 614, *supra,* where the court said:

"Men may have lawful and unlawful purposes, temporary or enduring. The distinction is vital and has different consequences and incidents. The conspiracy accomplished or having a distinct period of accomplishment is different from one that is to be continuous. If it may continue it would seem necessarily to follow the relation of the conspirators to it must continue, being to it during its life as it was to it the moment it was brought into life. If each conspirator was the agent of the others at the latter time he remains an agent during all of the former time. This view does not, as it is contended, take the defense of the statute of limitations from conspiracies. It allows it to all, but makes its application different. Nor does it take from a conspirator the power to withdraw from the execution of the offense or to avert a continuing criminality. It requires affirmative action, but certainly that is no hardship. Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until he does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law. As the offense has not been terminated or accomplished, he is still offending. And we think, consciously offending, offending as certainly, as we have said, as at the first moment of his confederation, and consciously through every moment of its existence."

By her efforts through Carlson to induce Anderson to leave the premises before he set the fire and to go immediately to her in the hospital where she was then confined, the defendant in the instant case took the most effective measures within her power to arrest the execution of the plan, if there was one, to burn the house. Anderson must have known that if she wanted him to comply with her request to leave the premises before he set the

fire she did not want him to burn the house. She not only withdrew in ample time from any plan to burn the house, but made that fact known to Anderson in an unmistakable manner. By withdrawing, defendant avoided criminal responsibility. Anderson was solely criminally responsible for the fire which he set. The facts being undisputed on this point, the verdict cannot stand.

Reversed.

MR. JUSTICE STONE, absent because of illness, took no part in the consideration or decision of this case.