**STATE of Minnesota, Respondent,**

v.

**Dale Allen STEWART, Appellant.**

No. C6-01-177.

Supreme Court of Minnesota.

May 9, 2002.

Lawrence W. Pry (# 144514), Assistant State Public Defender, Minneapolis, MN, for Appellant.

Michael A. Hatch, Attorney General, State of Minnesota, Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig (# 65730), Assistant Ramsey County Attorney, St. Paul, MN, for Respondent's.

## OPINION

GILBERT, Justice.

Appellant Dale Allen Stewart was found guilty of two counts of first-degree murder and the lesser-included offense of second-degree murder for shooting bicyclist Anthony Basta in the back on April 26, 2000. Appellant appeals his conviction and requests a new trial on the grounds that the district court erred in admitting (1) a computerized animation of the shooting to aid the testimony of the medical examiner and (2) other crimes evidence that appellant entered into a conspiracy to commit a murder for hire. For the reasons stated below, we affirm.

On April 26, 2000, at about 9:30 p.m., 17-year old Anthony Basta told his mother that he was going out for a bicycle ride. At about 10:00 p.m., Charles Joy was riding his bicycle in the northbound lane on Mississippi River Boulevard in St. Paul

and noticed an individual later identified as Basta riding his bicycle southbound in the bike lane. Joy observed a car approaching Basta from behind. When the car was next to Basta, Joy heard a "popping" sound and heard Basta say "ow." He then saw Basta ride forward on his bicycle for about another 10 feet and fall off the bicycle. Joy was unable to see the car's license plate or anyone in the car. Paramedics arrived at the scene at 10:12 p.m. and brought Basta to Regions Hospital in St. Paul, where he died at 10:26 p.m.

Investigators found no physical evidence or witnesses to the shooting other than Joy. On May 3, investigators received information that Victoria Ernst had heard someone at a party admit to the shooting. Ernst was at a party on April 30 with her boyfriend Brad Bassett and met a person whom she later identified as appellant. According to Ernst, appellant said that he and some friends were driving around, saw a "kid" riding a bike, and thought it would be funny to scare the kid. Appellant explained that he was sitting in the back of the car when he shot the gun out the window; he saw the kid fall off his bicycle, got scared, and left right away. Appellant said that he did not intend to kill the kid; he only wanted to scare him. Appellant signed a crime prevention petition "against people who do that kind of stuff" and visited the memorial for Basta.[1] Ernst believed that appellant "seemed sad" that he shot Basta. According to Bassett, appellant said that he returned to the scene of the shooting, signed some kind of crime prevention statement, and thought this was funny. Appellant also said that when he and his two companions left the scene

of the shooting, they planned to try killing someone again.

The police determined that appellant was the person to whom Ernst and Bassett had been speaking at the party. After locating appellant, Sergeant Younghans conducted three tape-recorded interviews of appellant. The first and second interviews took place at the homicide office on May 9. At the time of the first two interviews, appellant was not under arrest. According to Sergeant Younghans, appellant denied any involvement in the shooting at the first interview. Appellant said that he, Daniel Angus, and Jonathan McNeill drove to Northeast Minneapolis to look for two friends. They drove around for 4 hours before returning around 10:30 or 11:00 p.m. Sergeant Younghans asked appellant if he knew anything about the murder of Tony Basta and he said he did not. Sergeant Younghans also asked appellant if he had ever handled a gun and appellant answered that he had only handled a pellet gun. Sergeant Younghans then asked appellant if he had ever been on Mississippi River Boulevard and he responded that he had never been there. Sergeant Younghans told appellant what the police had learned from Ernst and Bassett. Appellant then said that he was at the party but that Ernst and Bassett were lying. Appellant also said that he was on probation, he was not the type of person that would do this, and he could never kill anybody.

Sergeant Younghans left the interview room and learned from other investigators that a gun had been seen at appellant's Bloomington apartment before the shooting. Sergeant Younghans then initiated a second interview with appellant. Sergeant Younghans asked appellant about the gun

---

1. Citizens made a memorial at the site where Basta was shot. At the memorial, there was a petition addressed to St. Paul Mayor Norm Coleman asking him to direct the Department of Public Works to keep the memorial. The petition also reminded citizens to stop the violence.

and suggested several possible scenarios of how the shooting occurred. According to Sergeant Younghans, appellant eventually cried and told Sergeant Younghans that he, Angus, and McNeill were driving along Mississippi River Boulevard on the night of the shooting. McNeill was driving, appellant was in the front passenger seat, and Angus was in the back. McNeill or Angus told appellant that there was a gun under the front seat. Appellant picked up the gun and then, being stupid and careless, stuck the gun out the window and pulled the trigger. He stated that he did not see Basta as he pulled the trigger. Appellant kept the shell casing from the fatal shot because it jammed the gun. He told Sergeant Younghans where the casings were located. Sergeant Younghans then placed appellant under arrest.

Investigators later recovered the shell casings from appellant's residence and a 9-mm semiautomatic handgun from McNeill's apartment. Ballistics tests confirmed that Basta had been shot with this gun.

On May 10, Sergeant Younghans conducted a third interview with appellant. At that third interview, Sergeant Younghans told appellant that based on what Angus and McNeill had told police, he believed that the shooting was not an accident. According to Sergeant Younghans, appellant then stated that the gun belonged to Angus. Appellant also explained that during the weeks preceding the shooting, appellant, Angus, and McNeill had discussed using Angus's gun to rob people and that it was Angus's idea to rob people. In the days preceding the shooting, the three of them had gone to Mississippi River Boulevard on several occasions with a loaded gun. Although they picked out individuals as targets, they did not follow through and rob them. Appellant told Sergeant Younghans that McNeill later

suggested that they kill their targets instead of robbing them and they agreed to this new plan. Angus used the term "first blood" to refer to the first person of the group who killed someone. Appellant said that he gave Angus and McNeill the impression that he was a willing participant in the scheme, but that he had no intention to rob or kill someone. Appellant only pretended to go along because he feared he would be rejected by his friends if he did not.

During this third interview, appellant also told Sergeant Younghans about the events leading up to the shooting and the shooting itself. According to Sergeant Younghans, appellant said that he, Angus, and McNeill drove to Mississippi River Boulevard on the night of April 26 with the purpose of killing someone just to see if they could do it. Someone spotted Basta and McNeill turned the car around to follow Basta. Appellant explained that he had the gun in his right hand by the door and, as they came up on Basta, he stuck his hand out the window and he pulled the trigger. Appellant told Sergeant Younghans that Angus and McNeill intended that appellant kill Basta, but that appellant's subjective intent was only to scare Basta. Appellant saw Basta grab his left side and heard him say "ouch." Appellant told Sergeant Younghans that the three of them laughed as they drove away, but appellant only laughed because the others did. Appellant said that later that night, they had a joke between themselves that involved saying "ouch." He also said that the three of them headed toward Roseville after the shooting because Angus wanted to shoot someone. They ended up driving back to St. Paul without shooting anyone else. After stopping to meet Angus's girlfriend, Jeanne Tromp, they returned to the scene of the shooting, but left because the street was blocked off by police.

On June 14, 2000, appellant was indicted for first-degree murder. On August 4, 2000, the state filed a *Spreigl*[2] notice indicating that it might offer at appellant's trial evidence that appellant and Angus had previously participated in a burglary and conspiracy to commit first-degree murder.[3] At a pretrial hearing on October 12, 2000, the court indicated that it would wait until the close of the state's case to make the ruling on the admissibility of the *Spreigl* evidence. At that same hearing, the state provided notice that one of the exhibits it would seek to present at the trial was a computerized animation prepared by Dan Davis, an assistant Hennepin County medical examiner, to aid the testimony of Dr. Susan Roe, an assistant medical examiner for Ramsey and Washington Counties, regarding Basta's internal injuries. The state said that the exhibit would help the medical examiner explain the autopsy findings because the exhibit illustrated the bullet path. The state explained that the bullet path was not readily understandable due to the fact that the shot came from a moving vehicle and Basta was on a moving bicycle when he was shot.

Following the state's argument in favor of admissibility, the appellant stated that the animation was the subject of a motion *in limine* filed by appellant. The animation was presented to the district court judge by use of Microsoft Power Point. The animation consists of four sequences.[4]

In the first sequence, Basta is facing the viewer and is bicycling on the side of the road. A car moves up from behind Basta and, as it moves toward Basta, the passenger in the front seat, who is holding a gun, takes his arm and places it outside the car. The arm rests on the side of the car and the gun is pointed toward the ground. When the car is alongside Basta, the passenger turns to look at Basta, lifts and extends his arm toward Basta, and fires the gun. A red beam indicates the bullet's path from the gun to where the bullet strikes Basta. In the second sequence, the viewer sees the back of Basta as he is bicycling down the road. The car is moving closer toward Basta from behind. The passenger in the front seat moves his arm out of the window and rests it on the side of the car, with the gun pointing down. When the car is next to Basta, the passenger turns to look at Basta, lifts and extends his arm, and fires the gun. A red beam indicates the bullet's path. The third sequence provides a view of the passenger side of the car. The passenger in the front seat moves his arm out of the window and rests it on the side of the car, with the gun pointing down. Then, the passenger looks at Basta, lifts and extends his arm, and fires the gun. A red beam indicates the bullet's path. The fourth sequence provides a front view of the car. Again, as in the other sequences, the passenger in the front seat moves his arm out of the window and rests it on the side of

---

2. In Minnesota, other crimes evidence is often referred to as *Spreigl* evidence after this court's decision in *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965).

3. In the *Spreigl* notice, the state simply identified these two offenses and parenthetically referred the reader to previously disclosed reports for the factual details of these crimes. These reports are not part of the record before this court.

4. The animation originally contained five sequences depicting different views of the shooting. Although all five were later admitted for demonstrative purposes, only four were shown during Roe's testimony to the jury. The state thereafter removed the sequence that was not shown to the jury from the exhibit. Thus, the exhibit available to this court consists of four sequences and it is these four sequences that are described in detail in this opinion.

the car, with the gun pointing down. The passenger looks at Basta and fires the weapon. A red beam indicates the bullet's path. After viewing this exhibit, the district court indicated that it would address the admissibility of the animation during the course of the trial.

On October 16, 2000, the state filed a memorandum in support of the admission of the animation exhibit. At a pretrial hearing on October 18, 2000, the state requested that the court rule quickly on the admissibility of the animation. The appellant responded that he had not yet submitted to the court his memorandum of law on the issue and opposed the admissibility of the animation on the grounds that (1) the medical examiner could explain the shooting without the animation and (2) there was no adequate foundation for the animation. Appellant went on to explain that because there had not been any testimony in the case, there was no foundation for the state's argument that the animation constituted an objective re-creation of the shooting.

The state responded that foundation for the animation would be laid throughout the trial. The state then said:

The point of the animation is to take it up to the point in showing the probable distance away of the weapon and the direction of the bullet to the entry wound and then the bullet path into the body of Anthony Basta. As I pointed out in my memorandum, the point of fire is the variable which completes the bullet path. The bullet path and distance from the point of fire and the entrance wound is a matter of regular concern to the medical examiner, and her use of the computer graphic animation is to aid the jury in understanding these kinds of concepts. And the animation is simply an indication upon time-honored courtroom practices of allowing courtroom demonstrations to show three dimensional things. And if the state was offering, for instance, a mannequin recreation with rods penetrating through the body, I don't believe the defense would find this particular kind of evidence objectionable. This graphic is simply an animation that places a little bit more information in the same view to the jury to appreciate the point of fire and the direction of fire and how it impacted the victim's body.

The court then questioned the state regarding the foundation for the animation. The prosecutor stated that at the trial he could augment the record to indicate that the animation is consistent with the width of the road, the width of the bike path, and the size of the car. He also stated that he expected the medical examiner to testify that the animation is a consistent reenactment of where the weapon was at the time Basta was shot. Appellant responded that his concern was that some of the scenes in the animation, such as the scene depicting events totally within the car, "would have no basis at all to show the entry wound and the angle and all of that." The court decided that at some time during the trial it would permit the medical examiner to testify outside of the hearing of the jury to determine whether the animation was accurate and helpful to her testimony.

On October 20, 2000, appellant filed a notice of motion and motion to preclude the computerized animation of the shooting. In that motion, appellant noted that relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Appellant then pointed out that in *State v. Hopperstad*, 367 N.W.2d 546 (Minn.App. 1985), the court of appeals found that a recreation of the incident that led to the

defendant's arrest was not relevant. Relying on *Hopperstad,* appellant argued that the animation was a re-creation of the shooting, it did not tend to prove or disprove a fact of consequence, and the court should therefore exclude the animation as not relevant. Appellant also argued that the animation was irrelevant because it did not explain scientific evidence or evidence that is not commonly understood by jurors. Appellant distinguished *State v. Rasinski,* 464 N.W.2d 517 (Minn.App.1990), where the court of appeals upheld the use of a video taped reenactment of an automobile accident. In *Rasinski,* the court found that the tape was admissible because it tended to show how a disputed accident occurred. Appellant argued that this case was distinguishable from *Rasinski* because here there is no dispute that Basta was shot while riding his bike.

In his motion, appellant also argued that the animation·was an improper aid for the medical examiner because the re-creations in the animation are "well beyond" what the state needs to show the angle of entry. Finally, appellant argued that even if the animation was relevant, it should be excluded as cumulative and prejudicial. In *Hopperstad,* the court found that the re-creation was cumulative because it re-stated graphically the testimony of certain witnesses for the state. The court also found that the re-creation was prejudicial because seeing the events depicted exactly as the state's witnesses said they happened was bound to affect the jury out of proportion to its value as evidence. Based on *Hopperstad,* appellant argued that the animation should be excluded as cumulative and prejudicial.

At appellant's trial, Sergeant Younghans recounted for the jury what appellant told him during the three interviews. The tapes of these interviews, with some redactions, were played for the jury. McNeill testified under an agreement that allowed him to plead guilty to second-degree murder. McNeill testified that he began "hanging out" with Angus and appellant before the shooting. According to McNeill, the three of them talked about how they could use Angus's gun and they all agreed to appellant's idea of using the gun to rob people at gunpoint. On the nights before the shooting, McNeill recounted that the three of them made trips to several parks in the metropolitan area to implement their plan but that they never did anything. McNeill testified that appellant willingly participated in these activities. McNeill also testified that their idea of how to use the gun evolved in the days before the shooting. The three of them agreed that instead of robbing people at gunpoint, they would shoot them and then rob them. By the evening of April 26, the three agreed to kill someone.

McNeill testified that on the night of the shooting they were driving northbound on River Road and that when they spotted Basta, Angus and appellant immediately said, "Let's get him." According to McNeill, Angus and appellant asked him to pull over and McNeill then pulled over and turned the car around to follow Basta. McNeill testified that he asked appellant and Angus if they were going to do it and they said yes and they were excited. McNeill testified that as they were closing in on Basta, appellant cocked the weapon and then rested his arm out the window lazily. The gun was pointed to the ground and the window was open. As the car approached Basta, appellant leaned out the window, extended his arm, and fired.

McNeill testified that they all made jokes about Basta's verbal reaction to his being shot ("ouch") and that appellant saved the casings. McNeill also testified that while they were driving, they had a discussion about where Basta had been hit

and appellant said that Basta had been shot in the back. After picking up Jeanne Tromp, they went back to the area where Basta was shot. Tromp testified that the three engaged in "ouch" jokes that night and that she observed appellant playing with two shell casings.

Jessica Sharlow, Angus's former roommate, testified that she heard appellant talk of using a gun to rob someone and saw him with a gun. Sharlow also testified that a few days after the shooting, appellant told her that he shot a kid on River Road and that he thought he shot Basta in the liver because he saw him grab his side when he fell.

Corrine Walker, appellant's cousin, testified that after appellant's arrest, appellant told her that while he shot Basta, he had not been trying to kill Basta, and that he had thought Basta would not die because he was aiming for Basta's lower back. Walker also testified that appellant said that he felt pressured by Angus and McNeill to do the shooting.

Before the close of the state's case, the court held a hearing outside the presence of the jury to address two issues—the admissibility of the computerized animation and the admissibility of the *Spreigl* evidence. With respect to the *Spreigl* evidence, the state told the court that it was offering the other crimes evidence of a burglary and murder for hire conspiracy to prove intent and absence of mistake or accident. In its memorandum of law in support of admitting the *Spreigl* evidence, the state argued that appellant, Angus, and Tanya Achenbach discussed killing Achenbach's husband and that, pursuant to these discussions, appellant and Angus burglarized the husband's residence. The state argued that the key issue in the case was whether appellant intentionally shot Basta. According to the state, appellant told Sergeant Younghans that he did not

intend to shoot or kill anyone because he is not the kind of person who would do those kinds of things. The state also asserted that appellant told Sergeant Younghans that in his own mind he was not a participant in the shooting. In light of these statements, the state argued that the admission of the *Spreigl* evidence was warranted.

Appellant argued that the *Spreigl* evidence should not be admitted because the state's case was not weak and the *Spreigl* evidence was highly prejudicial. According to appellant, the state's case was not weak because appellant had told police that the shot was an intentional shot rather than an accidental discharge of the weapon. Appellant also pointed out that even though appellant told Sergeant Younghans that it was not his nature to do the shooting, the state had already proved that this was not true.

Following arguments from counsel, the court observed that the state had provided notice of its intent to use the *Spreigl* evidence. The court also found that there was clear and convincing evidence, in the form of admissions by appellant and other participants, that appellant participated in the burglary and murder for hire conspiracy. The court then noted that appellant claimed through his attorney that he shot Basta by accident and had not intended to kill Basta. The court also noted that appellant made statements to the police that he intended to scare Basta and that he could not intentionally kill anyone. The court found that because the evidence regarding the burglary was not relevant, such evidence was not admissible as *Spreigl* evidence. However, the court found that the *Spreigl* evidence of the murder for hire conspiracy was relevant to show lack of mistake or accident and went to whether "[d]efendant had a predisposition to commit such an act based on the

statements that were given to the police." The court determined that the probative value of the evidence outweighed any prejudice because the jury could use the other crimes evidence to determine the absence of mistake or accident. The court ruled that the *Spreigl* evidence regarding the murder for hire conspiracy was admissible.

With respect to the animation, the court heard testimony from Dr. Roe to establish the appropriate foundation for the admissibility of the animation. The state said that it was offering the animation "as an illustrative or demonstrative exhibit in the course of Dr. Roe's direct testimony." On direct examination, Roe testified that it was a common concern of a medical examiner to document the distance of the firearm from the body of the victim at the time the shot was fired (the point of fire), the trajectory of the bullet before it hit the body, where the bullet entered the body, and the wound track. She testified that to make these determinations, she used information collected by investigators, including the fact that the victim was on a bicycle at the time he was shot and the shooter was in a moving vehicle, as well as her own autopsy findings. Roe testified that the fact that the victim was in movement presented problems in describing the wound track to the jury. She stated that the "animated recreations" would aid her in describing the trajectory of the shot and the wound track. Roe also testified that she had used diagrams and one- and three-dimensional models to aid her testimony in previous cases, but that this was the first time she had used an animated re-creation to illustrate her testimony. On cross-examination, Roe testified that although the animation sequences showed the trajectory angle, none of the five animated sequences showed the bullet entering into Basta's body. Roe also testified that she knew what information had been used to make the animation. Roe stated that she knew who prepared the animation and that it was someone she knew and had worked with before. The court asked Roe whether the animation would assist her in her testimony to the jury and she responded yes. She testified that the animation was different in some ways from one- and three-dimensional exhibits, but was much better in this visual era when people are so accustomed to looking at things on television. Roe testified the animation would make it "somewhat easier" to explain to a jury and was "very effective." She stated that using animations was becoming the state of the art. There was no request by appellant to examine the actual animator as to foundation. The animation was on a CD–ROM computer disc. The court admitted the animation.

Following this hearing, the trial resumed and Roe testified before the jury. Roe repeated much of the testimony she had just provided the court during the hearing. She testified that it is a common matter of concern for a medical examiner to determine the distance away the firearm might have been from the body of the victim. She also testified that the point of fire is a matter of concern to a medical examiner. Roe described the bullet's path through Basta's body based on her internal examination of Basta. She also explained the evidence indicating that the gun was not directly against Basta's skin when it was fired. Roe then testified that she was going to use the animation to explain the point of fire and the distance of fire. She explained that the animation was based on her autopsy findings as well as the fact that Basta was riding a bicycle when he was shot and that the shooter was in a moving vehicle. After showing the animation, Roe testified that the animation accurately depicts and is consistent with the autopsy findings, the distance of the firearm from the victim when the gun was

fired, and the direction and point of fire of the firearm. On cross-examination, Roe testified that the gun was two feet or greater from Basta's body surface when it was fired and explained why she reached this conclusion.

Following Roe's testimony, the state presented the testimony of some additional witnesses. The court then held a hearing outside the presence of the jury to inform counsel that it was granting appellant's request that the standard CRIMJIG 2.01 instruction be modified to clarify for the jury the purpose of the *Spreigl* evidence. The court then brought in the jury and informed the jurors that the state was about to introduce evidence of an occurrence that was being offered for the limited purpose of assisting the jurors in determining whether appellant committed the acts with which he was charged. The court told the jury that it could consider the evidence of the prior acts only on the issues of intent, absence of mistake, or accident. The court gave this identical instruction prior to closing arguments.

Detective Edward Hanson then testified about the *Spreigl* evidence. He stated that he interviewed appellant regarding an incident where Tanya Achenbach, appellant, and Angus had conversations about killing Achenbach's husband. Appellant told Hanson that Angus approached appellant and told him that Tanya wanted her husband killed and would pay them $1,000 to do it. Appellant also told Hanson that Angus's plan was for Angus and appellant to follow the husband to a place where no one would see them; they would then ask the husband for a cigarette; and when he reached for the cigarette, they would shoot him. Appellant said to Hanson that he did not think it was in him to kill the husband and that it was Angus's plan—not his.

Next, Sergeant Younghans testified that during his interview of appellant on May 10, he asked appellant about the plan to kill Achenbach's husband. Appellant told Sergeant Younghans that Achenbach offered him and Angus $1,000 to "off" her husband. Appellant said that they would have done it, but Achenbach never paid them any money and they got cold feet.

Tanya Achenbach then testified that in late March or early April, she visited her estranged husband and he beat and raped her. When she arrived back home, appellant, Angus, and Wendy Overby were in her apartment. Overby was Achenbach's roommate and was dating Angus. Appellant was very upset and said that he would kill the husband for what he had done to Achenbach. Angus and appellant immediately started talking about how and when they would do it. According to Achenbach, the plan was to have Achenbach call her husband and have him meet her at a park in St. Paul. Appellant and Angus could either drive up and shoot the husband or they could walk up and ask for a cigarette and then shoot him. Achenbach testified that appellant and Angus were very serious about this plan and there was no discussion of money. Achenbach knew Angus had a gun and was afraid. On cross-examination, Achenbach testified that she believed appellant and Angus were very serious about killing her husband. Achenbach also acknowledged that she did not call the police and tell them about the murder for hire scheme.

Following Achenbach's testimony, the state rested. Appellant subsequently called two witnesses and then testified in his own defense. With respect to the murder for hire issue, appellant testified that he told Achenbach that he would kill her husband. Appellant said this because he was upset about what the husband did to Achenbach, but that he did not mean it. According to appellant, Achenbach approached Angus and Angus proposed that

Achenbach pay $500 up front and $500 after the killing. Appellant testified that he had no intention of going through with it, but agreed to the plan because "It was just something that was being talked about and [I] thought it would be cool to talk about it."

With respect to the Basta shooting, appellant testified that he, Angus, and McNeill drove to Mississippi River Boulevard the night of April 26 looking for someone to shoot. Appellant testified that McNeill picked out Basta and, as the car pulled next to Basta, McNeill told appellant to pick up the gun and put it out the window. Appellant testified that his hand was not hanging outside the window at this moment—it was inside of the car and his arm was resting on the windowsill. Appellant testified that McNeill then told him to put his hand out the window and shoot and that he did so. Appellant insisted that he did not aim at Basta and that he was not looking at Basta when he fired the gun. He also insisted that he was only trying to scare Basta. Appellant testified that after he fired the gun, he heard Basta say "ouch," saw Basta grab his side, and realized that he shot Basta. According to appellant, Angus and McNeill intended to shoot and rob someone the evening of April 26, but that his own subjective intent was to scare Basta. He testified that he went along with the others because they were picking on him and rejecting him.

Immediately before closing arguments, the court instructed the jurors that the animation was not evidence in the trial or proof of any fact and that they should disregard the animation if it did not correctly reflect the testimony or other evidence in the case. The court did not permit the jurors to take the animation into the jury deliberation room. The court also instructed the jurors that the *Spreigl* evidence was admitted for the limited pur-

pose of assisting the jury in determining whether appellant committed the acts with which he was charged in the indictment. The court told the jurors that they may consider the evidence of prior acts only on the issues of intent, absence of mistake or accident. The court said that appellant was not being tried for and could not be convicted of any offense other than the charged offenses. The court further stated that the jury was not to convict appellant on the basis of the murder for hire and to do so might result in unjust double punishment.

The jury found appellant guilty of first-degree premeditated murder, first-degree felony murder (drive-by shooting), and second-degree felony murder. Appellant seeks a reversal of his conviction and a new trial on the grounds that the district court erred in admitting (1) the computerized animation of the shooting to aid the testimony of the medical examiner and (2) other crimes evidence that appellant entered into a conspiracy to commit a murder for hire.

I.

The district court admitted the computerized animation for illustrative purposes to aid the medical examiner in her testimony. Rulings on the admission of evidence at trial are within the broad discretion of the district court and are not reversed on appeal absent a clear abuse of discretion. *State v. Rhodes*, 627 N.W.2d 74, 84 (Minn.2001); *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn.1998). A defendant claiming that the district court erred in admitting evidence must demonstrate that the admission was both erroneous and prejudicial. *Id.*

Appellant contends that the animation is substantive evidence and that the district court abused its discretion in admitting the animation because the state failed to lay

the proper foundation for its admission and because the animation contains hearsay. Alternatively, appellant contends that the animation is demonstrative evidence and that the district court abused its discretion in admitting the animation because there was inadequate foundation for the animation, the animation was neither a fair nor accurate depiction of the shooting, the animation did not illustrate the medical examiner's testimony, and the animation was unfairly prejudicial. He also argues that the animation appeared so real that the jury was unduly influenced by it. For these reasons, appellant asks us to reverse his conviction and order a new trial.

■ Substantive evidence is evidence offered to support a fact in issue. *Black's Law Dictionary* 580 (7th ed.1999). By contrast, demonstrative or illustrative evidence is " 'admitted, when properly verified, to illustrate or express the testimony of a competent witness, but [is] not original evidence.' " *State v. Bauer*, 598 N.W.2d 352, 362 (Minn.1999) (quoting *Strasser v. Stabeck*, 112 Minn. 90, 92, 127 N.W. 384, 385 (1910)); *see also Black's Law Dictionary* 577 (noting that demonstrative evidence is usually offered to clarify testimony). At the hearing on the admissibility of the animation, the state argued that it was offering the animation "as an illustrative or demonstrative exhibit in the course of Dr. Roe's direct testimony." At that same hearing, on direct examination, Roe stated that the animation would aid her in describing the trajectory of the shot and the wound track. The district court admitted the animation for illustrative purposes. During her direct testimony at trial, Roe used the animation to explain the point of fire—the place where the shot was fired relative to where it hit the victim—and the distance of fire. Finally, the jurors were not permitted to take the animation with them to the jury room during deliberations. Because the animation was admitted and used for illustrative purposes, the animation is demonstrative evidence.

■ To determine whether the district court abused its discretion in admitting the animation as demonstrative evidence, we must evaluate whether the admission was erroneous and prejudicial. *Rhodes*, 627 N.W.2d at 84. The admissibility of a computer-generated animation used to assist a witness in testifying in a criminal case is a question of first impression in Minnesota. The standard for the admissibility of demonstrative evidence and visual aids is whether the evidence is relevant and accurate and assists the jury in understanding the testimony of a witness. *State v. DeZeler*, 230 Minn. 39, 46–47, 41 N.W.2d 313, 318–19 (1950). This same standard is also applicable to computerized animations.

■ Demonstrative evidence must be an accurate representation of the evidence in the record to which it relates. *DeZeler*, 230 Minn. at 46–47, 41 N.W.2d at 318–19. Appellant argues that there was inadequate foundation for the animation because Roe had no personal knowledge of most of the facts which the animation depicted and had no basis for authenticating any parts of the animated sequences which preceded the actual entry of the bullet into Basta's body, including the actual time in which the events took place, the distance of the gun from Basta at the time the shot was fired, and where appellant was looking when he pulled the trigger.

■ Minn. R. Evid. 703(a) provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or

inferences upon the subject, the facts or data need not be admissible in evidence.

See also State v. Bradford, 618 N.W.2d 782, 793–94 (Minn.2000). In this case, Roe's opinion regarding the point of fire was based on the autopsy findings and the fact that appellant was in a moving vehicle when he shot Basta, who was riding a bicycle. Roe testified that these are the types of facts relied on by medical examiners in forming an opinion on the point of fire and wound track. In addition, Roe testified that she was in contact with investigators, thus implying that she received additional information from investigators that formed the basis of her expert opinion. Roe's use of information other than the autopsy findings as the basis for the animation was therefore appropriate under Rule 703.

Furthermore, McNeill's testimony in conjunction with Roe's testimony was adequate to provide foundation for the introduction of the animation sequences that depicted testimony. More importantly, appellant had the opportunity to cross-examine Roe regarding the accuracy of her opinions and inferences and about every fact depicted in the animation. However, our analysis does not end here because the animation presented material information beyond the testimony.

■ In order to provide foundation, the state must demonstrate that the animation is relevant and accurate. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. Visual aids are relevant if they assist the jury in understanding a witness's testimony. State v. Walen, 563 N.W.2d 742, 748 (Minn.1997) (citing DeZeler, 230 Minn. at 46–47, 41 N.W.2d at 319). More specifically, we have held that visual aids such as photographs are admissible as an aid to a verbal description of objects and conditions when they are accurate and relevant to some material issue. Id. (citing State v. Martin, 261 N.W.2d 341, 344 (Minn.1977)). Here, the cause of Basta's death is a material issue in the case. Accordingly, the medical examiner's testimony regarding the wound path and the trajectory of the bullet is relevant to understanding the cause of Basta's death. Thus, the animation may be relevant to the extent that it is not original evidence and is an accurate expression or illustration to assist the jury in understanding the witnesses' testimony.

Based on the state's arguments to the court at certain pretrial hearings as well as Roe's testimony at the hearing held outside the presence of the jury to establish foundation for the animation, the expected subject matter of Roe's testimony to the jury was the point of fire, the bullet path, the distance of fire, and the entry wound. Roe was expected to explain to the jury that Basta was moving and that the shot was fired from a moving vehicle. Roe did in fact testify about these issues. She stated that the gunshot entrance was on the left side of Basta's trunk and used photographs to illustrate the entry of the wound. She then described the bullet's path through multiple organs in Basta's body. Next, a diagram was shown to the jury. The diagram illustrated the location of the entry of the wound and where in Basta's body the bullet was recovered. Roe then testified that the distance of the firearm from the victim's body when the shot was fired, as well as the point of fire, were common matters of concern for a medical examiner. She stated that the gun was not placed directly against the skin when it was fired. She also testified that she had information that Basta was

riding a bicycle and that the shooter was in a moving vehicle at the time the shot was fired. At this point, the state asked Roe if showing the animation would aid her in explaining the point of fire and the distance of fire. Roe answered "yes," and the animation was shown to the jury. Roe then stated that the animation was consistent with her findings regarding the distance of fire and the point of fire.

We must examine the subject matter of the animation to see if it is accurate and aids the jury's understanding of the medical examiner's testimony. The first, second, and fourth sequences are helpful in explaining the distance of fire and the point of fire to the extent that they depict a shot being fired from a moving vehicle and the bullet path from the car to the victim. However, the depiction of the events inside the car, including the facial expressions and movements of the passenger prior to firing the gun, did not express or illustrate Roe's testimony. The third animation sequence provides a view of the passenger side of the car. It depicts the passenger in the front seat taking his arm out of the car and resting it on the side of the car with the gun pointing down. It then shows the passenger turning his head, extending his arm, and firing the gun. These depictions do not aid the jury in understanding the distance of fire and point of fire. Only at the end of the sequence, when the bullet path from the gun to the body of the victim is depicted, does the animation aid the testimony of the medical examiner; and this evidence was cumulative of photographs and diagrams already in the record. Thus, the animation contains a great deal of material that was based on conjecture and did not illustrate Roe's testimony on the precise record. Indeed, the four animation sequences depicting appellant's face and eyes at the time of the shooting amounted to original evidence depicting appellant's in-

tent, the most hotly disputed element in the case. Therefore, while it is true that the animation may have made it easier for Roe to testify and may have been very effective in depicting the shooting, the animation's effectiveness was enhanced through artists' renditions of facial expressions and movements that did not merely re-create what was in the record, but created impressions depicting deliberate, intentional actions favorable to the state's theory of the case. Because the animation's contents exceeded what was in the record and created impressions that went right to the heart of what the state needed to prove as to intent, and because the animation exceeded the purpose for which it was admitted, the district court erred in admitting the entire animation.

 Even though the district court erred in admitting the animation, not every judicial error warrants reversal. An error is harmless if the verdict actually rendered was surely not attributable to the error. *Bradford,* 618 N.W.2d at 794. Appellant contends that admission of the animation was not harmless beyond a reasonable doubt because the issue in the trial was appellant's intent and the state did not have a lot of evidence of his intent to kill. For this reason, appellant contends that it cannot be said with certainty that the animation did not contribute to the jury's decision to convict. However, the animation did accurately illustrate the medical examiner's testimony regarding the wound path and trajectory. In addition, the evidence that appellant made substantial preparations to find someone to shoot was overwhelming. Such evidence, coupled with an overwhelming amount of corroborative and inculpatory evidence, including the testimony of appellant himself where he admitted the shooting, indicates that the verdict rendered was surely not attributable to the error. Furthermore, the dis-

trict court instructed the jurors that they should disregard the animation if it did not correctly reflect the testimony or other evidence in the case. The animation was not available to the jury during deliberations nor discussed in closing statements by counsel. For these reasons, the district court's error was harmless beyond a reasonable doubt.

 Although we hold that admitting the entire animation was error, our decision is not meant to prohibit the use of the new technology of computerized animations in court. However, such evidence must fairly express or illustrate the testimony of a witness so as to be helpful to the jury's understanding of the testimony. Animation is a new and powerful evidentiary tool, but must be used with great care.[5] McCormick has cautioned that one party's staged reproduction of facts creates the danger that "the jury may confuse art with reality" and that "the impressions generated by the evidence may prove particularly difficult to limit." 2 John William Strong, *McCormick on Evidence* 19 (5th ed.1999). Because of its dramatic power, proposed animations must be carefully scrutinized for proper foundation, relevancy, accuracy, and the potential for undue prejudice. In the future, if there is a proper foundation for such evidence, the district court should issue a cautionary instruction relating to the animation before playing the animation to the jury and in final instructions to help insure its proper use.

## II.

Appellant also claims that he was denied a fair trial when the district court admitted other crimes evidence that appellant entered into a conspiracy to commit a murder for hire. As a general rule, evidence of other crimes or misconduct is not admissible to prove the defendant's character for the purpose of showing that he or she acted in conformity with that character. Minn. R. Evid. 404(b);[6] *see also Kennedy*, 585 N.W.2d at 389. However, such evidence may be admitted for the limited purpose of showing motive, intent, absence of mistake or accident, identity, or a common scheme or plan. Minn. R. Evid. 404(b); *Kennedy*, 585 N.W.2d at 389.

 *Spreigl* evidence should not be admitted in a criminal prosecution unless (1) the state gives notice that it intends to use the evidence, (2) the state clearly indicates what the evidence is being offered to prove, (3) the evidence is clear and convincing that the defendant participated in the other offense, (4) the evidence is relevant and material to the state's case, and (5) the probative value of the evidence is not outweighed by its potential for unfair prejudice. *Kennedy*, 585 N.W.2d at 389 (citing *State v. Bolte*, 530 N.W.2d 191, 196–97 (Minn.1995)). These safeguards are designed to insure against the danger that " 'a jury may convict because, though guilt of the crime charged is not proved, it is satisfied to convict because of other crimes.' " *Spreigl*, 272 Minn. at 495, 139

5. *See, e.g.*, Gregory P. Joseph, *A Simplified Approach to Computer–Generated Evidence and Animations*, 156 F.R.D. 327 (1994); Fred Galves, *Where the Not–So–Wild Things Are: Computers in the Courtroom, the Federal Rules of Evidence, and the Need for Institutional Reform and More Judicial Acceptance*, 13 Harv. J.L. & Tech. 161 (2000).

6. Minnesota Rules of Evidence 404(b) provides:

Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

N.W.2d at 172 (quoting *State v. Doty,* 167 Minn. 164, 166, 208 N.W. 760, 761 (1926)).

Appellant claims that the district court erred in admitting the *Spreigl* evidence because three of these five safeguards were not met. More specifically, appellant argues that the other crimes evidence should not have been admitted because the state did not prove the prior misconduct by clear and convincing evidence, the other crimes evidence was not relevant to the state's theory that the Basta shooting was intentional, and the other crimes evidence was "overwhelmingly prejudicial."

▮▮▮▮ The crime of conspiracy requires (1) an agreement between two or more people to commit a crime and (2) an overt act in furtherance of the conspiracy. Minn.Stat. § 609.175, subd. 2 (2000); *State v. Kuhnau,* 622 N.W.2d 552, 556 (Minn. 2001) (citing *State v. Peterson,* 213 Minn. 56, 60, 4 N.W.2d 826, 828 (1942)). An overt act can be the slightest action on the part of a conspirator. *State v. St. Christopher,* 305 Minn. 226, 232 N.W.2d 798, 804 (1975). Other crimes evidence shall not be admitted unless the evidence is clear and convincing that the defendant participated in the other offense. The clear and convincing standard "requires more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Weber v. Anderson,* 269 N.W.2d 892, 895 (Minn.1978). This standard is met when the truth of the facts sought to be admitted is "highly probable." *Id.* This court has concluded that the clear and convincing evidence standard is not satisfied when the foundational evidence does not clearly show the person's direct participation in the other crime. *State v. Shannon,* 583 N.W.2d 579, 584 (Minn.1998).

In the instant case, four witnesses testified that appellant was involved in a plot to murder Tanya Achenbach's estranged husband. First, appellant himself testified that he told Tanya Achenbach that he would kill her husband, but testified that he never intended to do it. Second, Tanya Achenbach testified that appellant and Angus discussed how and when they would kill her husband after learning that she had been beaten and raped by him. Achenbach testified that she took their discussions seriously and was frightened by those discussions. Third, Officer Hanson testified that he questioned appellant about the alleged plot and that appellant told him that it was Angus's plan to kill Achenbach's husband. Hanson also testified that appellant told him that he did not think he was capable of killing the husband himself. Finally, Sergeant Younghans testified that appellant told him that he would have killed the husband, but that they did not because Achenbach did not pay him and Angus to commit the killing.

▮▮▮▮ The testimony of these witnesses indicates by clear and convincing evidence that there was a discussion about committing a crime. However, there was nothing in the record about any overt act done in furtherance of the conspiracy. Achenbach denied that there was an agreement or even a discussion of her paying any money for her husband to be killed. The district court reasoned that the other crimes evidence went to whether the defendant had a "predisposition to commit such an act," which is in the nature of character evidence offered to show that the appellant acted in conformity with that character in violation of Minn. R. Evid. 404(b), rather than clear and convincing evidence that appellant participated in the other offense. For this reason, the district court erred in admitting this other crimes evidence.

▮▮▮▮ Because we conclude that the district court abused its discretion in admitting the other crimes evidence, there is no need to address appellant's other argu-

ments regarding the propriety of admitting the other crimes evidence. However, even though the district court did err in admitting the other crimes evidence, a new trial is not required unless there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict. *State v. Bolte*, 530 N.W.2d 191, 198 (Minn.1995). As admitted by appellant's counsel, the state's case was not weak and appellant admitted he shot Basta. Appellant and others testified that a few days before the shooting, appellant had discussed with McNeill and Angus plans to seek out and kill someone. There were also tapes of three interviews with appellant in which he discusses his plans with McNeill and Angus to kill someone. Finally, the district court gave appropriate cautionary instructions regarding the *Spreigl* evidence. For these reasons, there is no reasonable possibility that the admission of the *Spreigl* evidence significantly affected the verdict.

Affirmed.

Concurring specially, LANCASTER, Justice, and ANDERSON, Russell A., Justice.

LANCASTER, Justice (concurring specially).

I concur with the result. I write separately, however, because I disagree with the majority's conclusion that the district court abused its discretion in admitting *Spreigl* evidence of appellant's agreement to kill Tanya Achenbach's husband. Under Minn. R. Evid. 404(b), evidence of "another crime, wrong, or act" may be admitted to show absence of mistake or accident. The majority holds that the district court abused its discretion by admitting the *Spreigl* evidence because the state failed to establish an overt act in furtherance of the conspiracy. In my view, the agreement itself, even if not accompanied by an overt act, was a "wrong" admissible under rule 404(b). As stated by the majority, the state established by clear and convincing evidence that appellant and Daniel Angus agreed to commit murder. Furthermore, appellant claimed he shot Anthony Basta because of the interpersonal dynamics between him and his carmates; they were pressuring him and making him feel rejected. That appellant and Angus, two members of this very group, had recently agreed to engage in criminal activity was relevant and probative on the matter of the interpersonal dynamics and the effect of those dynamics on appellant's state of mind when he shot Basta. Thus, I would hold that the district court was within its discretion in admitting this evidence.

ANDERSON, Russell A., Justice (concurring specially).

I join in the special concurrence of Justice Lancaster.