STATE of Minnesota, Respondent,

v.

Stanley Scott BOLTE, Appellant.

No. C8–93–1980.

Supreme Court of Minnesota.

April 14, 1995.

John M. Stuart, State Public Defender, Susan K. Maki, Asst. State Public Defender, St. Paul, for appellant.

Stanley Scott Bolte, Stillwater, pro se.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Raymond F. Schmitz, County Atty., Rochester, for respondent.

## OPINION

STRINGER, Justice.

Following a jury trial, defendant Stanley Scott Bolte was convicted of first-degree premeditated murder, second-degree intentional murder, and attempted coercion. The trial court sentenced defendant to life in prison

without parole for the first-degree murder, to a consecutive term of two years and one day for attempted coercion, and ordered defendant to pay restitution in the amount of $1,836.48. Defendant appeals from the judgment of conviction.

Defendant argues that he is entitled to a new trial because the trial court prejudicially erred in admitting certain other-crime evidence pursuant to Minn.R.Evid. 404(b). He maintains the trial court committed plain error of a prejudicial nature in its instructions on reasonable doubt. Defendant also asserts his conviction for second-degree intentional murder should be vacated pursuant to Minn. Stat. § 609.04 (1994). Defendant, in a pro se supplemental brief, raises other issues as well. The state concedes, and we agree, that defendant is entitled to have the conviction for second-degree intentional murder vacated. We affirm defendant's convictions of first-degree murder and attempted coercion.

This case arises from the murder of a 27–year–old Rochester man late on August 13, 1992, or early on August 14, 1992. The victim had dinner with friends on the evening of August 13th. When he did not return home that night and did not report to work the next day, his mother contacted authorities and placed posters around Rochester seeking information. That led to the discovery of the victim's abandoned car parked outside a Rochester grocery store; the car had been there since the evening of August 13th, when the victim purchased a few items at the store. In the days following his disappearance, the victim's mother received a series of phone calls from a man claiming that he was a member of the "Royal Cambodian Bloods" gang, telling her they had custody of her son, and demanding a ransom of $20,000. Police checked the victim's phone records and discovered that he had made a number of telephone calls to defendant's residence. They also recorded telephone calls made by defendant to the victim's mother. A number of witnesses subsequently identified the voice of the caller as that of defendant.

Police were aware of defendant's criminal record, which included two 1987 convictions for coercion involving falsely representing himself as a law enforcement officer while attempting to extort money from homosexual men in return for his agreement not to disclose their homosexuality. Believing that defendant was involved in the victim's disappearance, police put defendant under visual surveillance. They observed him putting considerable effort into cleaning the trunk and front passenger seat of his car, and cleaning a shovel. Police then approached defendant under the pretense of making door-to-door inquiries regarding the victim's disappearance. When the officers spoke with defendant in his yard, defendant denied knowing anything about the victim's disappearance.

That afternoon, officers, including FBI agents, returned to defendant's house with an audio tape recorder hidden in a brief case and questioned defendant for over three hours. Defendant initially denied knowing the victim or anything about his disappearance. After the officers told defendant that they had telephone records establishing that the victim had called defendant's house, defendant admitted that several months before he had answered a "personal" ad placed in a Rochester newspaper by "Joe," the victim's first name. Defendant told the officers that he was bisexual and had answered the ad out of curiosity. He denied personally meeting "Joe."

Defendant denied telephoning the victim's mother. When the officers informed defendant that they knew he had done so, defendant admitted making the calls but claimed he did so in an attempt to take advantage of the victim's disappearance. He continued to deny knowing the victim.

When police told defendant that they knew he had been with the victim on the night of his disappearance, defendant admitted he had. He said that he met the victim at the grocery store around 9:00 p.m. and that they drove together in defendant's car to a local hangout, Eastwood Park. Defendant claimed that he and the victim argued because defendant refused to engage in sexual activity with the victim. Defendant claimed he left the victim at the park.

Defendant claimed that the victim had threatened to tell defendant's wife that de-

fendant was bisexual. Defendant then admitted he and the victim had driven together in defendant's car after leaving the park, but claimed that he had dropped the victim off in the grocery store parking lot.

At this point in the interrogation defendant mentioned, for the first time, a person named "Randy." Defendant said that when the victim threatened him in the park, defendant told "Randy," who instructed defendant to drop the victim at the grocery store parking lot and "Randy" would take care of the problem. Defendant claimed he followed "Randy's" instructions, and did not know what, if anything, "Randy" did to him.

At this point, the police ceased their interrogation and searched defendant's home pursuant to a valid warrant.

During the search, police observed evidence of fresh digging in a wooded area near defendant's house. Upon further investigation, the police found the victim's body in a shallow grave. An autopsy established that he had been shot in the back of the head at close range with a .22 caliber rim-fire bullet. Laboratory tests of a sample of bodily fluids from the victim's body established that he had engaged in anal sex within approximately 24 hours preceding his death. The condition of the sample did not permit the Bureau of Criminal Apprehension ("BCA") to perform DNA testing.

Police recovered a .22 caliber Rugar brand single-action revolver from defendant's neighbor, who later testified that he had loaned the gun and bullets to defendant in July 1992. Police established that defendant had returned the gun to the neighbor's garage sometime after the murder, while the neighbors were on vacation. A firearms expert could not establish that the gun actually fired the fatal shot, but did testify that the bullets defendant borrowed from the neighbor were the same type as those used to kill the victim, that the gun could have fired the bullets, and that the gun had been fired twice since its last cleaning, which preceded the loan of the gun. The neighbor testified that defendant apparently had used two bullets.

BCA technicians found a blood stain in the trunk of defendant's car. DNA analysis indicated the blood was consistent that of the victim. Police also found evidence in defendant's home that further linked defendant with the murder and bore on the issue of premeditation. The state also introduced evidence of prior misconduct of defendant in connection with another man, B.T., who had placed a "personal" ad seeking homosexual companionship in a Rochester newspaper in April 1992. Defendant met with B.T. a few times. Then, in late July 1992, just weeks before the murder, defendant and a friend, S.L., arrived at B.T.'s home unannounced. The three men watched a pornographic movie involving homosexual men. When B.T. went into the bathroom he overheard defendant tell S.L. to "do it." When B.T. returned, defendant went into the bathroom. S.L. then pulled out a gun and fired at B.T.'s head. It is not clear whether S.L. fired a live bullet or a blank. Defendant and S.L. both claimed it was blank, but the bullet was never found. B.T. wrestled the gun away from S.L. and took the gun into the next room where he heard defendant say to S.L, "I thought you were going to do it." S.L. replied, "[t]his is sick." S.L. then helped B.T. remove the bullets from the gun and S.L. and defendant drove away. B.T. came forward with this information after reading news stories about the current offense.

Evidence found in the search of defendant's home included some pieces of twine, a ransom note written by defendant threatening to kill B.T. if $10,000 was not paid by a designated time, and a "review" list in defendant's handwriting listing fingerprints, tire tracks, what happens physically when a person is killed, discarding of shoes, a ransom "dropsite," and other matters.

Police located several witnesses who were present at Eastwood Park on the night of August 13, who identified defendant as having been there with the victim. These witnesses could not recall seeing S.L. at the park with defendant that night.

At trial, defendant gave another version of the events on the night of August 13. Defendant testified that S.L. showed up at Eastwood Park when he was there with the victim. Defendant claimed that "Randy" was S.L., and that he called him "Randy" because

he did not know his real name. Defendant testified further that he told S.L. he had argued with the victim and S.L. agreed to drive the victim back to the grocery store parking lot in defendant's car. He testified that when S.L. returned, S.L. told him he shot the victim because the victim was "queer." Defendant claimed he helped carry the body to the burial site because S.L. suggested the police would believe that he, defendant, killed the victim. Defendant denied helping bury the victim. He claimed the checklist found in his home was purely hypothetical and had no connection with either B.T. or the victim. S.L., testifying under a grant of use immunity, denied killing the victim or participating in his burial.

1. On appeal defendant contends that the trial court prejudicially erred in admitting other-crime evidence. Specifically, defendant challenges the admission of a certified copy of a 1977 Texas conviction for aggravated rape, and the admission of evidence relating to the incident involving B.T. Defendant does not dispute the admissibility of the conduct underlying his 1987 convictions for coercion of homosexual men in Rochester. Because of the potential for substantial prejudice to the defendant's case from the improper admission of other-crime evidence, we take this opportunity to review the circumstances where other-crime evidence may be admitted.

Two types of rules relate to the admission of other-crime evidence. First, Minn.R.Evid. 404(b) sets forth the substantive standard applied by the trial court in deciding whether to admit other-crime evidence. Second, in Minnesota we have adopted many procedural requirements and safeguards to govern the admission, presentation, and consideration of other-crime evidence.

 (a) The substantive standard governing the decision whether to admit other-crime evidence is set forth in Minn.R.Evid. 404(b). That rule provides:

Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, prepa-

ration, plan, knowledge, identity, or absence of mistake or accident. In a criminal prosecution, such evidence shall not be admitted unless the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence. Evidence of past sexual conduct of the victim in prosecutions under Minn. Stats. § 609.342 to 609.346 is governed by Minn.R.Evid. 412.

Minn.R.Evid. 404(b). While "other-crime evidence is not admissible to prove the character of a person in order to show that the person acted in conformity therewith * * * the evidence may be admitted, if for a legitimate purpose, rather than for the forbidden purpose of inferring propensity from character." *State v. Frisinger*, 484 N.W.2d 27, 32 (Minn.1992) (footnote omitted). Under this approach, other-crime evidence is not admissible for the purpose of establishing that the defendant is of "bad character" because he or she committed the prior crime and therefore has a general propensity to commit other crimes. However, in *State v. Wermerskirchen*, 497 N.W.2d 235, 239–40 (Minn.1993) we stated:

[t]he rule is a specific application of the "rule of multiple admissibility"—evidence that is inadmissible for one purpose (inference from immediate inference of bad character to inference that defendant acted in conformity therewith) should not be excluded if it is properly admissible for some other purpose (unless the trial court, in the exercise of discretion under Rule 403, decides to exclude the evidence).

*Id.; see also State v. Axford*, 417 N.W.2d 88, 92 (Minn.1987).

(b) A number of procedural requirements and safeguards govern the admission, presentation, and consideration of other-crime evidence. We announced many of these requirements in *State v. Billstrom*, 276 Minn. 174, 149 N.W.2d 281 (1967), and *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965).

 (i) The first requirement is that the state must furnish defense counsel with a written statement of other offenses it intends to show the defendant committed, subject to

certain narrow exceptions. *Spreigl,* 272 Minn. at 496–97, 139 N.W.2d at 173 (announcing the notice requirement).[1] Other-crime evidence generally should not be admitted unless, within a reasonable time before trial, the state complies with this notice requirement. *Id.;* Minn.R.Crim.P. 7.02. The notice requirement is designed to give a defendant sufficient opportunity to prepare for trial and to avoid situations where a defendant must defend against unexpected testimony regarding prior offenses. *State v. Schweppe,* 306 Minn. 395, 404, 237 N.W.2d 609, 616 (1975).

■ (ii) Beyond the *Spreigl* notice requirement, when a defendant demands disclosure of state's evidence and other relevant material pursuant to Minn.R.Crim.P. 9.01, the state must disclose evidence of other crimes not included in the *Spreigl* notice requirement. For example, the state must disclose other crimes for which defendant was previously prosecuted. *State v. Arndt,* 264 N.W.2d 637, 638–39 (Minn.1978).

■ (iii) The prosecutor must specifically articulate to the trial court how the evidence is relevant to an issue in the case, and demonstrate that the purpose of the evidence is not improper. *Billstrom,* 276 Minn. at 178, 149 N.W.2d at 284.

■ (iv) The prosecutor must also establish, to the trial court's satisfaction, the defendant's participation in the other offense by clear and convincing evidence. *Id.* at 179, 149 N.W.2d at 285.

■ (v) In determining admissibility, the trial court should engage in a balancing of factors such as the relevance or probative value of the evidence, the need for the evidence,[2] and the danger that the evidence will be used by the jury for an improper purpose, or that the evidence will create unfair prejudice pursuant to Minn.R.Evid. 403.[3] *See, e.g., Frisinger,* 484 N.W.2d at 32.

■ (vi) The trial court should give an appropriate cautionary instruction both upon receipt of the other-crime evidence and as part of the final instructions, even if not specifically requested to do so by defense counsel. *Billstrom,* 276 Minn. at 178, 149 N.W.2d at 285.

We have repeatedly stated that if the issue of admissibility of other-crime evidence is, in the trial court's view unclear, the trial court should give the benefit of the doubt to the defendant and exclude the evidence. *Spreigl,* 272 Minn. at 495, 139 N.W.2d at 172.

■ (c) Defendant challenges the admission of the certified copy of the 1977 Texas conviction for aggravated rape.[4] The

---

1. "Exceptions include: (a) offenses which are part of the immediate episode for which defendant is being tried; (b) offenses for which defendant has previously been prosecuted; and (c) offenses which are introduced to rebut defendant's evidence of good character." *Spreigl,* 272 Minn. at 497, 139 N.W.2d at 173.

2. In making the admissibility determination the trial court should consider the need for the evidence as one of the important factors bearing on the exercise of its discretion under Minn.R.Evid. 403. *State v. DeWald,* 464 N.W.2d 500, 504 (Minn.1991). "Need" for other-crime evidence is not necessarily the absence of sufficient other evidence to convict, nor does exclusion necessarily follow from the conclusion that the case is sufficient to go to the jury. A case may be sufficient to go to the jury and yet the evidence of other offenses may be needed because, as a practical matter, it is not clear that the jury will believe the state's other evidence bearing on the disputed issue. The trial court generally is in a better position than an appellate court to evaluate the reasonableness of and need for other-crime evidence in a particular case. It is usually

better practice for the trial court to postpone the *final* decision on admissibility until the state has presented all the other relevant evidence and the strength of the state's case on the issue in dispute can be assessed. *Id.* at 504–05.

3. "In Rule 403, 'prejudice' does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence, rather it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Cermak,* 365 N.W.2d 243, 247 n. 2 (Minn.1985) (quoting 22 Charles Wright and Kenneth Graham, *Federal Practice and Procedure—Evidence* § 5215 at 275 (1978)); *see also Frisinger,* 484 N.W.2d at 32 (emphasizing that it is wrong to equate "the legitimate probative force of [other-crime] evidence with 'unfair prejudice' spoken of in Minn. R.Evid. 403 * * *.").

4. When a defendant's prior conviction is admitted pursuant to Minn.R.Evid. 609 to impeach the defendant's credibility as a witness, normally, "the prosecutor may not elicit evidence concern-

trial court ruled that the 1977 conviction could not be used to impeach defendant's credibility as a witness pursuant to Rule 609,[5] but that the offense was admissible as relevant other-crime evidence pursuant to Rule 404(b).

■■■■ We believe the trial court erred in determining that the 1977 conduct was relevant. When deciding the relevance of other-crime evidence pursuant to Rule 404(b) "the preferred approach is for the trial court to focus on the closeness of the relationship between the other crimes and the charged crimes in terms of time, place and modus operandi." *Frisinger,* 484 N.W.2d at 31 (citing *State v. Filippi,* 335 N.W.2d 739, 743 (Minn.1983)). The closer the relationship, the greater the relevance or probative value of the evidence and the lesser the likelihood that the evidence will be used for an improper purpose. *Frisinger,* 484 N.W.2d at 31. "The ultimate issue is not the temporal relationship but relevance." *Wermerskirchen,* 497 N.W.2d at 242 n. 3. " 'Older' offenses sometimes are relevant, sometimes not." *Id.* In this case, however, the prior conduct was not similar.

The record indicates that in 1977 the defendant abducted the victim at gun point, identified himself as a police officer, and took her to an apartment where he raped her at gun point. The 1977 offense is somewhat similar to the 1987 coercion incidents admitted in evidence because in the 1987 incidents the defendant also held himself out as a law enforcement officer to coerce his victims.

The 1977 conduct is not similar to the charged offense. Given the time lapse and the lack of similarity between the 1977 offense and the charged offense, we hold that it was error to admit the evidence of the 1977 aggravated rape.

■■■■ We conclude, however, that the error was not prejudicial; a new trial is not required on this ground. When, after conviction we determine that the trial court erred in admitting other-crime evidence, our role is to examine the entire trial record and determine "whether there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict; * * * if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the evidence had not been admitted, then the error in admitting the evidence was prejudicial error." *State v. Post,* 512 N.W.2d 99, 102 n. 2 (Minn.1994).[6]

Based on our reading of the record, which we have summarized in some detail, we are satisfied that there is no reasonable possibility that the trial court's error in admitting the 1977 rape conviction significantly affected the verdict, and that any error was harmless beyond a reasonable doubt. In reaching this conclusion, we are influenced by a number of factors including the overwhelming evidence linking the defendant to the murder; the fact that the defense's evidence was weak and of highly doubtful credibility; the fact that the prosecutor did not rely on the evidence in question in his closing argument; the fact that the trial court gave an appropriate cau-

ing the facts underlying previous convictions used to impeach defendant's credibility." *State v. Edwards,* 343 N.W.2d 269, 273 (Minn.1984). Exceptions to this general rule exist, as when the defense "opens the door." *Id.* (citing *State v. Gardner,* 328 N.W.2d 159 (Minn.1983)). By contrast, when evidence of other-crimes is admitted pursuant to Rule 404(b), the state typically calls witnesses to testify to the facts underlying the prior offense. *See, e.g., State v. Crocker,* 409 N.W.2d 840, 843–44 (Minn.1987) (holding that a certified copy of a prior conviction may be admitted to prove the prior offense pursuant to Rule 404(b)).

**5.** Given that "more than [10] years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date," the

trial court could not have admitted the prior conviction for impeachment purposes unless the court had determined "in the interests of justice that the probative value of the conviction supported by specific facts and circumstances substantially outweigh[ed] its prejudicial effect." Minn.R.Evid. 609(b).

**6.** We take this opportunity to express our disapproval of the harmless error test employed by the court of appeals in its recent decision in *State v. Buhl,* 520 N.W.2d 177 (Minn.App.1994), *pet. for rev. denied* (Minn., Oct. 27, 1994). There, the court of appeals said that in order to conclude that the erroneous admission of other-crime evidence pursuant to Rule 404(b) was harmless, the appellate court must be able to say that the defendant's guilt was "conclusively proven." *Id.* at 182–83. That is not the correct test.

tionary instruction when requested, both during the trial and as part of the final instructions; and the fact that other other-crime evidence was properly admitted. *Crocker,* 409 N.W.2d at 844; *Filippi,* 335 N.W.2d at 744 n. 1.

■■ (d) Defendant argues that the evidence of the incident involving B.T. should not have been admitted because defendant received insufficient notice of the state's intent to offer it. As we stated earlier, other-crime evidence generally should not be admitted unless, within a reasonable time before trial, the state furnishes defense counsel with a written statement of other offenses it intends to show the defendant committed. *Spreigl,* 272 Minn. at 496, 139 N.W.2d at 173.

At the start of trial in this case the state had not formally notified the defense that it intended to present evidence relating to the B.T. incident. However, it appears that defendant intended to call B.T. as a witness. The lack of formal notice concerns only the admission of the seized evidence relating to B.T.'s testimony. This evidence was alluded to in the police reports provided to the defense during the discovery process and was listed among the materials seized from defendant's home. The state did not learn of the relevance of the evidence until after trial commenced. At that point it formally notified the defense of its intent to present the evidence.

While reaffirming the importance of and the need for full compliance with the notice requirements of *Spreigl,* 272 Minn. at 496, 139 N.W.2d at 173, and Minn.R.Crim.P. 7.02 and 9.01, we believe that the record in this case demonstrates substantial compliance with the notice requirements and lack of prejudice to the defendant.

■■ 2. Defendant also argues that the trial court's instructions on reasonable doubt were inadequate, and that the court should have instructed the jury that "[i]f you find beyond a reasonable doubt that defendant has committed a crime but you have a reasonable doubt which crime has been committed the defendant is guilty of the lesser crime only." This language is derived from CRIMJIG 3.20, the recommended instruction

on "lesser crimes." Instruction 3.20 reads as follows:

> The law provides that upon the prosecution of a person for a crime, if the person is not guilty of that crime, the person may be guilty of a lesser crime.
>
> (A) (the) lesser crime(s) in this case are:
> ———————————————.
>
> You are instructed that the presumption of innocence and the requirement of proof beyond a reasonable doubt apply to these lesser crimes. If you find beyond a reasonable doubt that defendant has committed a crime but you have a reasonable doubt which crime has been committed the defendant is guilty of the lesser crime only.

10 Minnesota Dist. Judges Ass'n, *Minnesota Practice,* CRIMJIG 3.20 (3d ed. 1990). We agree with the comment to CRIMJIG 3.20 that "[i]n appropriate cases it may be necessary to use this instruction even though the lesser-included offenses are charged as counts in the complaint." *Id.* at 37 (citing *State v. Moore,* 458 N.W.2d 90, 95 n. 5 (Minn. 1990)); *cf. State v. Thurston,* 299 Minn. 30, 35, 216 N.W.2d 267, 270 (1974) (indicating that when instructing on lesser offenses the trial court should make it clear to the jury which offense is in fact the lesser offense).

■■ Here defense counsel did not request CRIMJIG 3.20. Defendant therefore forfeited his right to obtain relief on this ground, unless the trial court's failure to give the instruction *sua sponte* constituted plain error of a prejudicial nature. *State v. Glidden,* 455 N.W.2d 744, 747 (Minn.1990); Minn. R.Evid. 103(d). We hold that the trial court did not commit plain error because the court expressly instructed the jury pursuant to CRIMJIG 11.02, that if it had a reasonable doubt on the issue of premeditation, but found that all the other elements of premeditated murder were present, the jury should find defendant guilty of second-degree intentional murder. *State v. Boerner,* 260 N.W.2d 564, 567 (Minn.1977).

3. We have considered other issues raised by the defendant in his pro se supplemental brief, including an alleged violation of Minn. R.Crim.P. 9.01 regarding the prosecution's failure to disclose it intended to play certain

audio tapes of the defendant, and the adequacy of representation provided by defendant's trial counsel. The record fails to establish that defendant is entitled to any relief on these grounds.

In summary, we agree that defendant's conviction of second-degree intentional murder should be vacated because it is an included offense of first-degree premeditated murder under Minn.Stat. § 609.04. We affirm defendant's convictions of and sentences for first-degree premeditated murder and attempted coercion.

Affirmed as modified.