**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2359**

State of Minnesota,
Respondent,

vs.

Dean Aaron Anderson,
Appellant.

**Filed June 8, 2015
Reversed and remanded.
Ross, Judge**

Isanti County District Court
File No. 30-CR-10-308

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Jeffrey Edblad, Isanti County Attorney, Cambridge, Minnesota, Scott A. Hersey, Special Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Reilly, Presiding Judge; Ross, Judge; and Kirk, Judge.

## S Y L L A B U S

Subpart 1(3) of the first-degree controlled-substance-crime statute, Minnesota Statutes section 152.021, subdivision 1, prohibits only the sale of a controlled substance containing amphetamine, phencyclidine, or a hallucinogen, even when the sold controlled substance is packaged in dosage units.

## O P I N I O N

**ROSS**, Judge

A jury found that Dean Anderson sold pills containing oxycodone—a narcotic and Schedule II controlled substance—and the district court convicted him of first-degree sale of a controlled substance under Minnesota Statutes section 152.021, subdivision 1(3) (2008). Anderson says his trial was unfair, and he also challenges his conviction on the legal theory that subdivision 1(3) does not criminalize the sale of oxycodone because oxycodone is not one of the drugs identified in the statute. We are not convinced by Anderson's contention that he was prejudiced at trial by the district court's allegedly unfair trial treatment. But our plain-language reading of subdivision 1(3) informs us that the statute establishes as a first-degree offense the sale of only those controlled substances containing amphetamine, phencyclidine, or a hallucinogen. We therefore reject the state's position that the statute broadly prohibits the sale of 200 doses of *any* controlled substance, including oxycodone, whenever the substance is packaged in dosage units. We reverse the judgment, reducing Anderson's conviction to third-degree sale of a controlled substance under Minnesota Statutes section 152.023, subdivision 1(1), and we remand for the district court to enter a judgment of conviction and resentence Anderson for that offense.

## FACTS

S.D. reported to the Isanti County Sheriff's Office in April 2010 that she had been buying Percocet, a prescription drug containing oxycodone, from Dean Anderson. S.D.'s husband had discovered that she was pawning her jewelry to finance her addiction, and

he pressured S.D. to report Anderson to the police. S.D. made the report and agreed to cooperate with investigators.

Law enforcement officers arranged three controlled buys between S.D. and Anderson to occur in Anderson's home between May 6 and June 1, 2010. During each police-monitored transaction, S.D. gave Anderson $300 and Anderson gave her a plastic baggie containing 150 Percocet pills, totaling 450 Percocet pills for $900. Police secured a warrant to search Anderson's home and executed it two days after the last controlled buy. They seized four baggies of white pills in a nightstand drawer in Anderson's bedroom. These baggies each appeared to contain the same number of pills as those Anderson sold to S.D. A forensic analyst at the Bureau of Criminal Apprehension tested the pills and confirmed that they were Percocet containing oxycodone. Police learned that Anderson had obtained the Percocet pills using his own prescription.

Based on the three controlled buys, Isanti County charged Anderson with one count of first-degree sale of a controlled substance under Minnesota Statutes section 152.021, subdivision 1(3) (2008). That subdivision establishes that a person commits a first-degree controlled substance crime if on multiple occasions within a defined period he unlawfully sells "mixtures of a total weight of 50 grams or more containing amphetamine, phencyclidine, or hallucinogen or, if the controlled substance is packaged in dosage units, equaling 200 or more dosage units." The state alleged in the complaint that, because Anderson had sold 450 pills containing the controlled substance oxycodone, which is packaged in dosage units (pills), Anderson committed a first-degree offense under the statute.

3

Anderson's trial did not commence until May 2013. Anderson appeared the first day wearing a clerical collar and wanting to be referred to as "Reverend Anderson." The state objected. The record indicates that, without his ever engaging in any study or training or even attending a religious service, Anderson obtained "ordination" as a cleric in the "Universal Life Church" through an online application process that takes about five minutes. The district court forbade Anderson to wear the clerical collar in the courthouse, where he could be seen by jurors, and it prohibited him from being referred to as "Reverend."

Testifying officers detailed Anderson's three controlled buys. The jury heard incriminating recorded telephone conversations between Anderson and S.D., and it heard the surveillance recordings that captured the discussions during each drug transaction. The prosecutor also successfully offered into evidence the four plastic baggies of white pills found in Anderson's nightstand. S.D. testified that the controlled buys were not her only purchases from Anderson; she disclosed that she had purchased Percocet from Anderson on a weekly or monthly basis from 2005 to 2010.

Anderson testified in his own defense. He admitted that he had a prescription for pills containing oxycodone. And he acknowledged that he met with S.D. on the dates of the controlled buys. But he denied selling her any of his prescription drugs. He offered an explanation for his seemingly incriminating recorded statements during the controlled buys. He proposed that S.D. came to his house each time only to get business cards, not drugs, so she could distribute the cards on his behalf. He said that when the recording

4

reveals that he said, "I have them all counted out in hundreds," he was merely commenting about the number of business cards he was giving her.

The district court instructed the jury that when a "mixture containing oxycodone is packaged into pills, one pill equals one dosage unit" under Minnesota Statutes section 152.021, subdivision 1(3). The jury found Anderson guilty of first-degree sale of a controlled substance under the statute. The district court sentenced Anderson to 86 months in prison, and it stayed execution of the sentence for 30 years conditioned on probationary terms. Anderson appeals his conviction.

## ISSUES

I.      Is selling 200 or more dosage units of oxycodone a first-degree controlled substance crime under Minnesota Statutes section 152.021, subdivision 1(3)?

II.     Did the trial include errors that prejudiced Anderson?

III.    Do any of the issues raised in Anderson's pro se supplemental brief warrant reversal?

## ANALYSIS

Anderson appeals his conviction of first-degree sale of a controlled substance, arguing that multiple errors require reversal. He first argues that the statute under which he was charged and convicted does not criminalize the sale of oxycodone as a first-degree offense. He argues that the district court improperly prohibited him from wearing his clerical collar and improperly admitted evidence at his trial. And he suggests in his pro se supplemental brief that attorneys and the district court engaged in misconduct. Only one of his arguments has substantial merit.

5

# I

Anderson convincingly argues that the evidence was not sufficient to convict him of first-degree sale of a controlled substance under Minnesota Statutes section 152.021, subdivision 1(3) (2008). We review insufficient-evidence claims by determining whether the evidence, viewed most favorably to the conviction, would allow the jury to reach the verdict that it did. *State v. Hurd*, 763 N.W.2d 17, 26 (Minn. 2009). But because Anderson rests his argument on the contention that the district court misinterpreted the statute, we consider the statutory interpretation question de novo. *See State v. Garcia-Gutierrez*, 844 N.W.2d 519, 521 (Minn. 2014).

Of the four ways a person can commit a first-degree drug offense based on the sale of a controlled substance under section 152.021, the state accused Anderson of unlawfully selling "one or more mixtures of a total weight of 50 grams or more containing amphetamine, phencyclidine, or hallucinogen or, if the controlled substance is packaged in dosage units, equaling 200 or more dosage units." Minn. Stat. § 152.021, subd. 1(3). Anderson sold pills containing oxycodone—an opiate and a Schedule II controlled substance. *See* Minn. Stat. § 152.02, subd. 3(1)(a) (2008). As an opiate, oxycodone is also classified as a "narcotic drug" under the controlled-substance statutes. Minn. Stat. § 152.01, subd. 10(1) (2008). But, as Anderson points out, oxycodone is not amphetamine, phencyclidine, or a hallucinogen. *See* Minn. Stat. § 152.02, subds. 2(3) (listing substances identified as hallucinogens), 3(3)(a) (listing amphetamine and its salts and isomers), 3(4)(e) (listing substances identified as depressants, including phencyclidine) (2008). Oxycodone is therefore not on the list of specified drugs in the

first-degree sale provision under which Anderson was convicted. Based on this, Anderson contends that the statute's phrase "or, if the controlled substance is packaged in dosage units" does not include the drugs he sold because, he maintains, the phrase includes only the three controlled substances identified in the preceding phrase.

The state acknowledges that oxycodone is not amphetamine, phencyclidine, or a hallucinogen. But it asks us to accept, as the district court accepted, its much broader interpretation of the statute. It argues that the phrase "or, if the controlled substance is packaged in dosage units" does not refer to those controlled substances defined in the previous phrase (amphetamine, phencyclidine, or hallucinogen). The state maintains instead that the phrase "or, if the controlled substance is packaged in dosage units" refers to *any* "controlled substance."

If a statute's language is clear and unambiguous, we rely on it alone to determine meaning. *Garcia-Gutierrez*, 844 N.W.2d at 521. That each party here offers a different interpretation of the same provision does not necessarily mean that the statute is ambiguous. A statutory ambiguity exists only if the competing interpretations are reasonable. *Amaral v. Saint Cloud Hosp.*, 598 N.W.2d 379, 384 (Minn. 1999).

Looking only at the language of subpart 3, we observe at the outset that the provision is syntactically awkward. So at a minimum, some construction is necessary to clarify meaning. Specifically, the gerund phrase "equaling 200 or more dosage units" is challenging because it is a description not clearly attached to any noun or noun phrase:

> A person is guilty of controlled substance crime in the first
> degree if:
> . . . .

7

(3) on one or more occasions within a 90-day period the person unlawfully sells one or more mixtures of a total weight of 50 grams or more containing amphetamine, phencyclidine, or hallucinogen or, if the controlled substance is packaged in dosage units, *equaling 200 or more dosage units*.

Minn. Stat. § 152.021, subd. 1(3) (emphasis added). Although the preceding adjectival gerund phrase ("containing amphetamine, phencyclidine, or hallucinogen") grammatically attaches to a noun phrase and plainly modifies that phrase ("one or more mixtures"), the adjectival gerund phrase beginning with "equaling" does not appear to attach to that noun phrase, at least not at first glance. But the sentence is not so awkward that its meaning is unclear.

Because we assume that the legislature intends that all statutory words have meaning, Minn. Stat. § 645.16 (2014), we know that the seemingly detached descriptive phrase must attach to and describe *something*. We look to the substance of the subpart in context to find the implied noun. This dovetails with our effort to decide whether the language is ambiguous. To decide whether a provision is ambiguous, we consider the provision within the context of the statute. *Kachman v. Blosberg*, 251 Minn. 224, 229, 87 N.W.2d 687, 692 (1958); *see also Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000) ("We are to read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations."). And we look to how the statute actually applies to inform us about its meaning. *See* Minn. Stat. § 645.16 (instructing courts to look at "the words of a law in their application to an existing situation"). Our assessment of Minnesota Statutes section 152.021,

8

subdivision 1, in context convinces us that the syntactically awkward subpart carries a clear and unambiguous meaning.

The third subpart fits in a subdivision that provides the necessary context:

> A person is guilty of controlled substance crime in the first degree if:
>
> (1) on one or more occasions within a 90-day period the person unlawfully sells one or more mixtures of a total weight of ten grams or more containing cocaine, heroin, or methamphetamine;
>
> (2) on one or more occasions within a 90-day period the person unlawfully sells one or more mixtures of a total weight of 50 grams or more containing a narcotic drug other than cocaine, heroin, or methamphetamine;
>
> (3) on one or more occasions within a 90-day period the person unlawfully sells one or more mixtures of a total weight of 50 grams or more containing amphetamine, phencyclidine, or hallucinogen or, if the controlled substance is packaged in dosage units, equaling 200 or more dosage units; or
>
> (4) on one or more occasions within a 90-day period the person unlawfully sells one or more mixtures of a total weight of 50 kilograms or more containing marijuana or Tetrahydrocannabinols, or one or more mixtures of a total weight of 25 kilograms or more containing marijuana or Tetrahydrocannabinols in a school zone, a park zone, a public housing zone, or a drug treatment facility.

Minn. Stat. § 152.021, subd. 1. The subdivision identifies the ways that a drug seller becomes criminally liable for a first-degree drug offense. None of the other three numbered subparts has the syntactical difficulty we find in subpart 3.

The four subparts are organized as a disjunctive list. And each subpart has two operative components.

9

The first component is a list of controlled-substance types. Each subpart includes the phrase "one or more mixtures." The definition section of the chapter informs us that "mixture" here specifically means or includes "controlled substance." *See* Minn. Stat. § 152.01, subd. 9a (2008) (defining "mixture" as "a preparation, compound, previous mixture, or substance *containing a controlled substance* regardless of purity" (emphasis added)). Common knowledge informs us why the legislature calls a controlled substance a "mixture." Whether a drug is usable as a powder or liquid and measured by weight, or it is instead produced and quantified in dosage units, the final consumable product is usually a mix of substances—a "mixture"—not a pure chemical. And each of the subparts includes its own unique list of controlled substances: cocaine, heroin, or methamphetamine in the first subpart; narcotic drugs other than cocaine, heroin, or methamphetamine in the second; amphetamine, phencyclidine, or hallucinogen in the third; and marijuana or Tetrahydrocannabinols in the fourth.

And for the second component, each subpart also specifies the quantity of the listed controlled substances that a drug seller must sell within 90 days to earn a first-degree conviction. And in doing so, the provision also assigns the method of measurement to standardize its quantity-based severity delineations between first-, second-, and third-degree offenses. Most of the drugs listed are of the common illegal variety, and, as such, they are not customarily manufactured uniformly or packaged uniformly for sale. Not surprisingly therefore, the legislature chose product weight to quantify the drugs in each severity level, and it designated grams as the measurement unit.

10

So for each of the three offense levels, in every subpart, including subpart 3, the legislature provides the model for determining the offense level for each drug-sale crime: the specific *type* and the specific *quantity* of the controlled substance sold. *See* Minn. Stat. §§ 152.021, subd. 1, 152.022, subd. 1, 152.023, subd. 1 (2008).

With this background we can more easily construe subpart 3 with its additional language. The additional language includes a conditional phrase and another descriptive gerund: "if the controlled substance is packaged in dosage units, equaling 200 or more dosage units." Before turning to identify what the descriptive gerund phrase modifies, we consider one of its elements. The language adds a feature to the quantity component. Specifically, the additional language in subpart 3 introduces the term "dosage unit" as a quantifier instead of "grams." Unlike more common illegal substances, some drugs are quantified for sale based on something other than weight. For example, at least one illegal drug—the hallucinogen LSD—is typically prepared for use or distribution on drug-saturated paper strips divided into identifiable, single-use segments. Each of these blotter segments is a "dosage unit." *See State v. Bolinger*, 647 N.W.2d 16, 18–19 & n.1 (Minn. App. 2002). And other illegal drugs are manufactured in pill form, in which case we have inferred that each pill is a dosage unit. *See, e.g.*, *State v. Bauer*, 792 N.W.2d 825, 828 (Minn. 2011) ("Bauer committed the third-degree controlled substance crime when he sold 10 ecstasy pills to the CI."). In similar fashion, many pharmaceuticals are not commonly distributed by weight; they are manufactured in uniform, readily identifiable and quantifiable tablets or capsules. Each of these pharmaceutical pills is also a dosage unit.

11

Now we turn to the gerund phrase of subpart 3. That is, we still must decide whether the phrase "equaling 200 or more dosage units" refers to *any* controlled substances or only those controlled substances listed in the subpart. We look first at the state's suggested interpretation. The state would have us interpret the subpart to say that a person is guilty of a first-degree controlled substance crime if, on one or more occasions within a 90-day period, the person unlawfully either sells one or more mixtures of a total weight of 50 grams or more containing amphetamine, phencyclidine, or hallucinogen or sells 200 or more dosage units *of any controlled substance that is sold in dosage units*. One must accept three assumptions to arrive at the state's interpretation: that the *definite* article "the" should be replaced with the implied *indefinite* article "an" or "any"; that the portion of subpart 3 that deals with drugs made into dosage units was intended to differ formally and substantively from each of the other portions of the subdivision, which determines severity based both on drug *quantity* and drug *type*; and that the dosage-unit exception to quantifying controlled substances applies to the drugs listed in *all four* of the subparts even though it was written into only the third subpart. A plain-language interpretation does not accommodate these assumptions.

We reject the first assumption necessary to accept the state's construction because we "cannot supply that which the legislature purposely omits or inadvertently overlooks." *Martinco v. Hastings*, 265 Minn. 490, 497, 122 N.W.2d 631, 638 (1963). We must "construe words and phrases according to rules of grammar and according to their most natural and obvious usage." *Amaral*, 598 N.W.2d at 384. To assume that the legislature intended the reader to replace the stated definite article "the" with the indefinite article

"any," one must both add words to the statute and ignore the most natural and obvious usage of the stated words. "Because articles have a demonstrative value, the meaning of a phrase may shift depending on the article used." *The Chicago Manual of Style* ¶ 5.75 (15th ed. 2003). Applying the definite article that the legislature included, it appears that the article "the" in the phrase, "or, if *the* controlled substance is packaged in dosage units," applies only to the "controlled substances" or "mixtures" just referenced ("amphetamine, phencyclidine, or hallucinogen").

We reject the second assumption because the text gives us no reason to suppose that the legislature intentionally deviated from its otherwise consistent practice of delineating severity based on both drug quantity and drug type. Why would the legislature establish a single, all-inclusive bright-line *number* of drugs to prove a first-degree crime in all drug sales but not also establish a single, all-inclusive bright-line *weight* of drugs to prove a first-degree crime in all drug sales? Although this approach might be plausible if the legislature had intended that a "dosage unit" would indicate some relatively constant strength level of the controlled substance, we have previously ruled out that theory. *See State v. Palmer*, 507 N.W.2d 865, 668–69 (Minn. App. 1993) (rejecting appellant's argument that "'dosage unit' must be defined as a specific strength of [the controlled substance] per dose"), *review denied* (Minn. Jan. 14, 1994).

And we reject the third assumption because we doubt the legislature would confusingly include a dosage-unit exception by writing it only in the third subpart, which lists just three types of controlled substances, if it meant for the exception to apply to all controlled substances. This is especially so because the legislature knows perfectly well

13

how to craft a statute with the meaning suggested by the state. The legislature demonstrated this when it defined a "tax obligor" in part as a person who possesses "42-1/2 grams of marijuana, or seven or more grams *of any controlled substance*, or ten or more dosage units of *any controlled substance which is not sold by weight*." Minn. Stat. § 297D.01, subd. 3 (2014) (emphases added). Given the language of the subpart within the entire subdivision and section, we conclude that the state's proffered interpretation is simply not reasonable.

Recognizing the legislative objective to include both a type and quantity of controlled substance to delineate severity, and knowing that "mixture" in each subpart includes the term "controlled substance" by definition, we are satisfied that the phrase "the controlled substance" in the text, "or, if the controlled substance is packaged in dosage units," includes only those controlled substances in the immediately preceding list of substances, or in other words, "amphetamine, phencyclidine, or hallucinogen."

Recognizing the legislative objective also aids us in reconstructing the language of subpart 3 syntactically to accommodate the dangling descriptive gerund phrase, "equaling 200 or more dosage units," which follows after the added conditional phrase, "if the controlled substance is packaged in dosage units." And the resulting reconstruction mirrors our interpretation. We can begin by abridging the subpart's other quantifying descriptive phrase, "of a total weight of 50 grams or more," to the simpler gerund phrase, "weighing 50 or more grams." Once we do this, we see more clearly that this quantifying phrase perfectly parallels the disputed additional gerund phrase, "equaling 200 or more dosage units." Or we could accomplish the same thing by converting the additional

14

phrase from "equaling 200 or more dosage units" to "of a total quantity of 200 dosage units or more" (to mirror "of a total weight of 50 grams or more"). Either way, the result is a parallel construction of the two phrases which, implicitly, must modify the same noun phrase, "mixtures . . . containing amphetamine, phencyclidine, or hallucinogen." We therefore render subpart 3 this way:

> A person is guilty of controlled substance crime in the first degree if . . . on one or more occasions within a 90-day period the person unlawfully sells one or more mixtures containing amphetamine, phencyclidine, or hallucinogen
> > *weighing 50 or more grams*,
> > > or if the controlled substance is packaged in dosage units,
> > *equaling 200 or more dosage units*.

Because this interpretation is clear and unambiguous based on the language of the statute and in context with its application, we will not look beyond the language to search for meaning.

Only for the sake of completeness, we also mention one other interpretation—one rightly suggested by neither party. One might mistakenly attempt to fix the subpart's syntactic awkwardness by relying on the placement of the conjunction "or" between the gerunds "containing" and "equaling." Relying on that placement and treating those gerund phrases as parallel, one might attempt to reorganize the subpart as follows:

> . . . unlawfully sells one or more mixtures of a total weight of 50 grams or more [*either* (1)] containing amphetamine, phencyclidine, or hallucinogen *or* [(2)] equaling 200 or more dosage units [if the controlled substance is packaged in dosage units].

15

The parties properly chose not to suggest this construction. It is substantively implausible, even though it may seem grammatically plausible. It is implausible because it would make subpart 3 establish a first-degree offense for the sale of controlled-substance pills only when the pills *both* weigh more than 50 grams *and* equal 200 or more dosage units. This would confound the legislature's clear objective to standardize the severity levels for drug sales depending on quantity and type. The construction would also make prosecuting the sale of lightweight but potent and dangerous drugs, like LSD, more difficult. So even if, grammatically speaking, one could argue that this construction follows the plain words, "[i]n an exceptional situation, applying a statute's plain words might obviously and directly controvert, rather than follow, the legislature's clear and manifest purpose." *Dornbusch v. Comm'r of Pub. Safety*, 860 N.W.2d 381, 384 (Minn. App. 2015) (citations omitted). The construction would make it more difficult to prosecute the sale of pills, and this is an absurd result that controverts rather than follows the legislature's clear and manifest purpose. Our construction is instead both grammatical *and* logical.

Based on our construction and interpretation of subpart 3, section 152.021, subdivision 1, does not criminalize the sale of oxycodone as a first-degree offense. Oxycodone is not a controlled substance listed among the specified drugs in the subpart. If the legislature intends to impose a first-degree severity level for the sale of this drug in pill form, it must reword the statute to so indicate. Or if, as the state argues, the legislature intends to impose the first-degree level of severity for *all* controlled substances whenever they are packaged in dosage units and sold in large quantities,

16

again, the legislature must plainly indicate this. Our construction and interpretation follows from the plain language. We believe it also captures the intent of the legislature, but if it does not, "[a]ny incongruity . . . must be addressed by the legislature, not this court." *State v. Bauer*, 642 N.W.2d 760, 763 (Minn. App. 2002).

Because the state did not prove that the pills Anderson sold contained amphetamine, phencyclidine, or hallucinogen, his conviction under section 152.021, subdivision 1(3), must be reversed. When we reverse a judgment, the rules of criminal procedure allow us to "(1) direct a new trial; (2) vacate the conviction and enter a judgment of acquittal; or (3) reduce the conviction to a lesser included offense or to an offense of lesser degree, as the case may require." Minn. R. Crim. P. 28.02, subd. 12. The jury found that Anderson unlawfully sold pills containing oxycodone, a narcotic and Schedule II substance, and this finding establishes a third-degree controlled-substance crime. *See* Minn. Stat. § 152.023, subd. 1(1) (prohibiting the unlawful sale of "one or more mixtures containing a narcotic drug"). We therefore reverse the judgment and reduce the conviction to an offense of lesser degree, and we remand for resentencing.

Anderson argues also that the district court erroneously instructed the jury that "one pill equals one dosage unit." Although no error is apparent to us in this instruction, we do not address the challenge given our holding on the statute's meaning.

## II

Anderson contends that trial errors prejudiced him and that the resulting conviction cannot stand. He argues that the district court violated his constitutional right to freely exercise his religion by ordering him not to wear his clerical collar on

17

courthouse property during the trial. He also contests the district court's admission of certain evidence. He specifically maintains that the district court should not have admitted testimony that Anderson sold drugs to S.D. during the period before the controlled sales that are described in the criminal complaint. He also maintains that the court should not have admitted into evidence the four baggies of pills found during the search of his home after the charged sales occurred.

We can assume without deciding that all of these decisions by the district court were erroneous because, even if they were, none prejudiced Anderson in a manner warranting reversal. A defendant ordinarily "has the burden on appeal of establishing prejudicial error entitling him to a new trial." *State v. Lehman*, 511 N.W.2d 1, 3 (Minn. 1994). The alleged error of prohibiting Anderson from wearing a clerical collar on courthouse property was, at most, harmless. Both the First Amendment to the United States Constitution and Article I, Section 16 of the Minnesota Constitution protect an individual's right to freely exercise religion without government interference. But evidence of a witness's religious beliefs is generally inadmissible to show credibility or the lack of it. Minn. R. Evid. 610. And reversal of a criminal conviction does not necessarily follow a district court's infringement of a criminal defendant's right to freely exercise his religion during the criminal trial. In *State v. Tate*, we held that by failing to conduct an inquiry into the substance and sincerity of a criminal defendant's religious beliefs, the district court erred when it instructed the defendant to tuck inside his shirt a cross that he was wearing around his neck. 682 N.W.2d 169, 174–75 (Minn. App. 2004), *review denied* (Minn. Sept. 29, 2004). We nevertheless affirmed the conviction, rejecting

the appellant's argument that violating his religious rights was inherently prejudicial because the district court's order did not affect a fundamental right guaranteed in a criminal trial. *Id*. at 175. Likewise here, Anderson does not suggest how the violation of his claimed right to represent himself as a minister involved any criminal-trial rights or otherwise had any impact on the proceedings or influenced the verdict.

Anderson's evidentiary challenges similarly identify alleged errors that did not prejudice his trial defense. We will not reverse a conviction even when a district court erroneously admits evidence unless we see a reasonable possibility that the erroneously admitted evidence significantly influenced the verdict. *State v. Ness*, 707 N.W.2d 676, 691 (Minn. 2006). Overwhelming evidence of guilt can undermine the assertion that the verdict resulted from an erroneous evidentiary decision. *State v. Bolte*, 530 N.W.2d 191, 198 (Minn. 1995). The jury received overwhelming evidence that Anderson sold pills containing oxycodone to S.D. on at least one of the three days identified in the complaint, and this is all that is necessary to establish the reduced offense of third-degree sale. *See* Minn. Stat. § 152.023, subd. 1(1). The jury heard about Anderson's drug sales from law enforcement officers, from S.D., and from a forensic specialist, leaving little room for doubt as to guilt. It even heard a recording of Anderson's own voice discussing the transaction as it occurred. The court also repeatedly instructed the jury "not to convict the defendant on the basis of any occurrences" before or after the dates of the controlled buys specified in the complaint. Anderson's primary opposing evidence was his smirkable representation that what sounded on the recording like a drug deal was really a business-card deal. This is the sort of evidence that is so "weak and of highly doubtful credibility"

19

that it cannot lead to reversal, particularly where, as here, the district court also gave a cautionary instruction to prevent the allegedly erroneous evidence from affecting the verdict. *Bolte*, 530 N.W.2d at 198–99.

Because the allegedly improper evidence could not have significantly affected the verdict, the alleged evidentiary errors are harmless.

## III

Anderson asserts in a pro se supplemental brief that the prosecuting attorneys, the judge, and one of his defense attorneys committed misconduct during his criminal proceedings. Our thorough examination of the record leads us to reject these assertions on factual grounds. And even if the assertions had factual support, Anderson provides no legal authority for the notion that they warrant reversal. *See State v. Bartylla*, 755 N.W.2d 8, 22 (Minn. 2008) (holding that an appellate court need "not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority").

## DECISION

Because Minnesota Statutes section 152.021, subdivision 1(3), does not establish as a first-degree controlled-substance crime the sale of controlled substances other than amphetamine, phencyclidine, or hallucinogens, we reverse Anderson's judgment of conviction for selling oxycodone. We reduce his conviction to third-degree sale of a controlled substance under section 152.023, subdivision 1(1), and we remand for the district court to correct the judgment and to resentence Anderson accordingly.

**Reversed and remanded.**